**Stephen CHOJNACKI, Robert Gustin, Emil Kouba, Donald Nickel, James Scott, Roland Sherwood, James Tracy, Robert Votava, and Edward Vruwink, Plaintiffs–Appellants,**

**v.**

**GEORGIA–PACIFIC CORPORATION, Great Northern Nekoosa Corporation, David W. Reynolds, and GNN Employee Protection Plan, Defendants–Appellees.**

**No. 96–2609.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1996.

Decided March 18, 1997.

---

Randall J. Andersen, Robert J. Kay (argued), Kay & Andersen, Madison, WI, for plaintiffs–appellants.

Joseph A. Ranney, Donald L. Bach, Dewitt, Ross & Stevens, Madison, WI, Forrest W. Hunter (argued), Charles H. Morgan, Warren R. Hall, Jr., Alston & Bird, Atlanta, GA, for Georgia–Pacific Corp.

Randall A. Constantine (argued), Robert E. Johnson, Jr., Keith L. Richardson, Elrod & Thompson, Atlanta, GA, for David W. Reynolds, GNN Employee Protection Plan, Great North Nekoosa Corp.

Before COFFEY, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In November 1989 Great Northern Nekoosa's paper mills were buzzing with rumors of a possible hostile takeover. To provide a sense of security for its employees who were not protected either by collective bargaining or individual severance agreements, Great Northern established the EPP, an employee benefit plan governed by ERISA, 29 U.S.C. § 1001, *et seq*. The EPP was designed to provide tin parachutes—lump-sum severance benefits providing less protection than the lavish golden parachutes offered to top-tier corporate executives—to full-time, salaried employees in the event they quit after experiencing a change in employment location or a material reduction in compensation or authority due to a change in control of the company.

Five months after Great Northern adopted the EPP the rumors of a hostile

takeover proved true. When Great Northern's employees reported to work on March 6, 1990, they discovered that their employer had become a wholly owned subsidiary of the Georgia–Pacific Corporation. About 6 months later, Georgia–Pacific informed Great Northern's employees that on January 1, 1991, they would be required to switch from Great Northern's retirement plan to Georgia–Pacific's plan. While some aspects of the Georgia–Pacific plan worked to the benefit of some employees, like those who wanted to tap into their lump sums before age 55, other aspects of the Georgia–Pacific plan offered less favorable benefits than those available from Great Northern. For example, Georgia–Pacific's plan required retirees electing certain health insurance options to pay a greater percentage of their premiums.

In November 1990, after receiving questions from employees about the differences between the two plans, Georgia–Pacific's human resources department invited all salaried employees eligible for early retirement—those who had worked for Great Northern for at least 10 years and were at least 55 years old—to a series of informational meetings. The purpose of the meetings was to explain the differences between the retirement plans and encourage employees to lock in benefits from Great Northern by taking early retirement.

The plaintiffs in this case are nine former Great Northern employees who attended those meetings. During one of the sessions, one of the plaintiffs, James Tracy, asked a Georgia–Pacific human resources representative if he could still receive EPP benefits if he opted for early retirement. The representative responded that he wasn't sure and told Tracy to check the EPP for himself. About the same time, three other plaintiffs asked Dean Ward, a Great Northern human resources supervisor, and Kathleen Termaat, Great Northern's benefits administrator, if they would be eligible for EPP benefits if they took early retirement. Ward and Termaat informed the three employees they would probably not be eligible for EPP benefits. The remaining five plaintiffs neither asked nor were told anything about the effect of early retirement on EPP eligibility. In the end, the plaintiffs decided to lock in benefits from Great Northern by retiring on December 31, 1990.

Shortly after retiring, the plaintiffs applied for EPP severance benefits. Based upon their individual years of service and salary, the plaintiffs sought sums ranging from $64,-000 to $134,000. In support of their applications the plaintiffs pointed to the following language in the EPP:

D.  Plan Implementation

The Employee Protection Plan shall provide benefits only if there is a Change of Control and shall apply to a Covered Employee whose employment is terminated within two years of such Change of Control under the following circumstances:

1.  The employee experiences a material reduction in responsibilities or authority or reduction in salary or benefits, and the employee voluntarily terminates.

The plaintiffs claim they experienced a reduction in benefits because Georgia–Pacific's retirement plan offered less favorable health insurance benefits. Additionally, one plaintiff, Donald Nickel, asserts that he suffered a reduction in responsibilities as a result of the change in control. Nickel maintains that Georgia–Pacific let it slip that his position as "Supervisor of Coating and Stock Preparation" was going to be eliminated and his duties would be distributed to other employees. Nickel alleges that after word of this possible reorganization got around, the employees under his supervision stopped asking him questions.

The plaintiffs' applications were denied by a delegatee of David Reynolds, Great Northern's vice-president for employee relations and the administrator of the EPP. The plaintiffs appealed, and Reynolds affirmed the denial. He reasoned that the plaintiffs retired to avoid any change in their retirement packages, and, as a result, they never experienced a reduction in benefits. Reynolds also denied Nickel's appeal, noting that his claim was based on a proposed reorganization outlined in a chart drafted by an outside consultant and that the proposal had not

been implemented prior to Nickel's retirement.

Reynolds did award EPP benefits to at least two other Great Northern employees taking early retirement. Joseph Schneider and Bruce Brockman, both customer service department supervisors, had been informed in December 1990 that their jobs would be transferred from Wisconsin to Georgia–Pacific's Atlanta headquarters in March 1991. Rather than relocate, Schneider and Brockman retired on December 31, 1990. Both later applied for benefits under section D.2 of the EPP. That provision states that an employee is entitled to benefits if, within 2 years of a change in control,

> [t]he employee experiences a change of employment location of more than 35 miles from the employee's present employment location, and the employee voluntarily terminates[.]

Reynolds found because Schneider and Brockman were forced to make up their minds on the Atlanta move in 1990, they experienced a change in location and were entitled to EPP benefits. Shortly after Schneider and Brockman were awarded benefits they were temporarily rehired by Georgia–Pacific as outside consultants to train their replacements. At the time they were awarded EPP benefits, Reynolds was not aware that either Schneider or Brockman would—or even could—be rehired.

On October 6, 1995, the plaintiffs sued Reynolds, the EPP, Great Northern, and Georgia–Pacific in district court. First, the plaintiffs alleged that Reynolds wrongfully denied them benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Next, the plaintiffs sought recovery under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), claiming Reynolds, Great Northern, and Georgia–Pacific breached a fiduciary duty to advise them that electing early retirement would preclude them from receiving EPP benefits. Finally, they requested attorney fees under section F of the EPP, which provides:

> If a Covered Employee in good faith institutes any legal action in seeking to obtain or enforce ... the validity or enforceability of any right or benefit provided by this

Plan, the Company will pay for all reasonable legal fees and expenses actually incurred by such employee.

On May 30, 1996, the district court granted summary judgment for the defendants on the ERISA claims. The court found Reynolds had not acted arbitrarily or capriciously in denying the benefits; Great Northern and Georgia–Pacific were not fiduciaries under the EPP; and Reynolds had not breached any fiduciary duty owed to the plaintiffs. Finally, the court concluded that the plaintiffs were entitled to any legal fees they may have incurred. On June 18, 1996, however, the district court found because the plaintiffs had a contingent fee agreement with their lawyers, they never incurred legal fees. The court determined that only an award of costs would be appropriate and ordered the plaintiffs to submit a detailed statement of their expenses.

The plaintiffs contend that summary judgment on the ERISA claims was inappropriate and that the district court overlooked a small sum of attorney fees they actually paid before the contingent fee agreement was reached. We review the district court's decision *de novo*. *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62 (7th Cir.1996).

■ We turn first to the plaintiffs' claim for benefits. As an initial matter, we must ask what degree of deference-if any—we should give to Reynolds' determination that the plaintiffs were not eligible for EPP benefits. The answer to that question turns upon the language of the EPP itself. If Reynolds lacked the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," our review is *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). If, on the other hand, the EPP gave Reynolds discretionary authority, we defer to his judgment unless it was arbitrary and capricious. *See Gallo v. Amoco Corp.*, 102 F.3d 918 (7th Cir.1996).

■ So, what does the plan have to say about Reynold's power? Section B of the EPP provides that Reynolds, in his capacity as Great Northern's vice-president for em-

ployee relations, is "responsible for interpretations of this Plan." The district court found this language sufficient to trigger deferential review. The plaintiffs argue that because the EPP only mentions the power to "interpret" and not the ability to "construe," Reynolds does not have the authority to determine eligibility for EPP benefits. As a result, the plaintiffs say, *de novo* review is required. In support of that conclusion, the plaintiffs cite *C.A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163 (5th Cir. 1977). In *C.A. May Marine*, the Fifth Circuit, relying on the definition of "construction" in the 1957 edition of *Black's Law Dictionary*, stated that in a strict sense, "interpretation" is limited to exploring the written text, while "construction" allows consideration of extrinsic sources such as legislative history. *Id.* at 1165.

■ We think the district judge properly declined to split hairs. No magic words are required to confer discretion on an administrator, *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 379 (7th Cir.1994), and we recently noted that the decisions of an administrator who possessed the "discretion to interpret" a plan were entitled to deferential review. *See Gallo*, 102 F.3d at 921. Finally, even *C.A. May Marine* recognized that "construe" and "interpret" are often used synonymously. *See* 557 F.2d at 1165 (citing *Black's Law Dictionary* (4th ed. 1957)). As a result, we will review Reynolds' decision to deny EPP benefits under the arbitrary and capricious standard.

■ The first factor to pin down in determining whether Reynolds acted arbitrarily is whether he operated under a conflict of interest. *Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57. While a conflict of interest does not change the standard of review we apply to an administrator's decision, it will cause us to give the arbitrary and capricious standard more bite. *See Donato*, 19 F.3d at 380 n. 3. The more serious the conflict, the less deferential our review becomes.

■ The plaintiffs argue that "it is virtually impossible to imagine an individual with a larger conflict of interest" than Reynolds. As evidence of the alleged conflict, they point out: the EPP is unfunded, so any payments come directly from Georgia–Pacific's pocketbook; Reynolds was paid by Georgia–Pacific; he owned 12,000 shares of Georgia–Pacific stock—worth over $650,000—while serving as plan administrator and later acquired 20,000 more; he served as an officer of other Georgia–Pacific subsidiaries; and he reported directly to Georgia–Pacific's CEO.

We have rejected similar claims of conflict of interest. In *Chalmers v. Quaker Oats Co.*, for example, an unfunded ERISA plan was administered by a committee made up of the corporation's officers. 61 F.3d 1340, 1344 (7th Cir.1995). We found no conflict of interest, noting that ERISA endorses the idea that a corporate officer can also serve as a plan administrator. We explained that in such cases the "impact on a company's welfare of granting or denying benefits under a plan will not be sufficiently significant as to threaten the administrator's partiality." *Id.* In support, we pointed out that Quaker Oats' annual revenue was over $6 billion, so the company was unlikely to "flinch at paying out $240,000." *Id.* Finally, we noted that companies who develop reputations for being tight-fisted when it comes to paying benefit claims might have trouble attracting new talent and be forced to pay higher wages. *Id.*

As in *Quaker Oats*, the facts of this case undermine the plaintiffs' claim that Reynolds operated under a serious conflict of interest. For example, Georgia–Pacific's total revenue for fiscal year 1993—the year in which the plaintiffs' claims were denied—was over $12.3 billion. The largest payment sought by any of the plaintiffs was $134,000. Paying out the EPP benefits sought by the plaintiffs would not have seriously affected Georgia–Pacific's bottom line or caused the value of the company's stock to take a hit. As a result, the fact that Reynolds owned as many as 32,000 shares of stock—which amounted to less than .036 percent of the over 90 million available shares of Georgia–Pacific common stock—did not undermine his impartiality. Finally, one of the plaintiffs' later arguments (which we address shortly) takes even more wind out of the plaintiffs' sails on this issue. The plaintiffs maintain that Brockman and Schneider—the two employ-

ees whose entire department was transferred to Atlanta—were similarly situated to the plaintiffs, yet each received over $70,000 in EPP benefits. If the conflict of interest clouding Reynolds' judgment was as severe as the plaintiffs would have us believe, why didn't Reynolds simply find an excuse to deny Schneider and Brockman EPP benefits as well?

■ Having concluded that any conflict of interest Reynolds may have had was not serious, we arrive at the hub of the plaintiffs' claim for benefits—was Reynolds' decision arbitrary or capricious? To convince us that it was, the plaintiffs must show that Reynolds not only made the wrong call, but that he made a "downright unreasonable" one. *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990).

■ The plaintiffs cannot show that Reynolds' decision was wrong, let alone unreasonable. Reynolds found that the plaintiffs never "experienced" the reduction in benefits as required by section D.1. We agree. The plaintiffs certainly anticipated a reduction in benefits, but when they retired they were set to receive exactly the same benefits as when Georgia–Pacific took over Great Northern. In short, the plaintiffs had a choice: take early retirement and lock in Great Northern's retirement package, or keep working, switch to a Georgia–Pacific's arguably less favorable retirement plan, and become eligible for EPP benefits. They simply chose not to "experience" any change.

However, as we mentioned before, the plaintiffs have a second card up their sleeves on their claim for benefits. They assert that Schneider and Brockman no more "experienced" a change in their employment location than the plaintiffs "experienced" a reduction in benefits, yet Reynolds approved Brockman's and Schneider's EPP claims. According to the plaintiffs, Reynolds' inconsistent interpretation of the word "experience" is a smoking gun proving he acted arbitrarily in denying their claims.

Reynolds counters that Schneider and Brockman received benefits under section D.2 of the EPP, while the plaintiffs sought their tin parachutes under section D.1. He explains that while he routinely paid D.2 "transfer" claims, he viewed D.1 claims with greater scrutiny because determining whether an employee had experienced a "material reduction" was a far more difficult and fact-specific task than simply assessing whether an entire department was being transferred. Additionally, Reynolds argues—and the district court agreed—that his interpretation of the word "experience" was not inconsistent. He contends that Schneider and Brockman experienced the change in employment location in December 1990 because they faced immediate termination if they decided not to relocate.

■ We agree that the decision to grant benefits to Brockman and Schneider did not render Reynolds' decision to deny the plaintiffs' claims arbitrary or capricious. While evidence of inconsistent interpretations is one factor we consider when determining whether an administrator acted unreasonably, *see Gallo*, 102 F.3d at 922, Reynolds reviewed over 1,000 claims under the EPP. Of those, the plaintiffs could only point to two cases in which Reynolds reached an allegedly inconsistent result. Even if true, that level of inconsistency is hardly enough to render Reynolds' decision to deny the plaintiffs' claims arbitrary or capricious. Accordingly we must conclude that the district court was correct when it determined that Reynolds did not act arbitrarily or capriciously in denying the plaintiffs benefits under section D.1 of the EPP.

■ We also agree that Reynolds did not act arbitrarily in denying Nickel's claim. Nickel based his claim on an outside consultant's recommendation that Georgia–Pacific eliminate his position and merge his responsibilities with those of another employee. Had that reorganization been implemented before Nickel retired, he would certainly have a strong claim for EPP benefits. However, the change did not take place before Nickel retired. In fact, the proposal had not even been implemented by the time Reynolds denied Nickel's EPP claim some 6 months later. As a result, the decision to deny Nickel's benefits was not incorrect.

That brings us to the plaintiffs' other ERISA charge, the § 502(a)(3) claim. The plaintiffs contend that Reynolds, Great Northern, and Georgia–Pacific breached their fiduciary duties by failing to tell the plaintiffs that taking early retirement would render them ineligible for EPP benefits. First, the parties disagree on which defendants operated as fiduciaries. The plaintiffs argue that not only Reynolds, but Georgia–Pacific and Great Northern are fiduciaries of the EPP. The defendants argue only Reynolds fits the bill.

■ We do not need to reach the issue of who qualifies as a fiduciary. For no matter which defendants can be properly tagged fiduciaries, none of them breached a duty to the plaintiffs. While we do not agree with the district court that mere passive behavior can *never* give rise to a claim for a breach of fiduciary duty, we have allowed such claims only when a fiduciary fails to give a beneficiary material information regarding a plan and the fiduciary's silence is misleading. *See Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986 (7th Cir.1993).

In *Anweiler,* an employee developed Hodgkin's disease and, pursuant to his employer's ERISA plan, began receiving disability payments from the plan's insurance carrier, Aetna. The plan called for Aetna's payments to be offset by any other benefits the employee might receive. After the employee was later awarded Social Security benefits, his employer asked him to sign an agreement changing the beneficiary on his life insurance policy from his wife to Aetna to cover any double payment of disability benefits. *Id.* at 989. The employee was never informed that the agreement was not mandatory and that he could change the beneficiary back to his wife at any time. When the employee died, his wife sued for the proceeds of the life insurance policy. Although we denied relief on other grounds, we found a breach of fiduciary duty, reasoning that the employer's failure to explain the optional nature of the agreement was misleading and left the employee without "full and complete material information." *Id.* at 991–92. In reaching that conclusion, we relied on *Eddy v. Colonial Life Ins. Co.,* 919 F.2d 747 (D.C.Cir.1990). In *Eddy,* a plan beneficiary's group health insurance was being terminated. The beneficiary asked a plan fiduciary if he could somehow continue the coverage. The fiduciary told him the insurance could not be "continued." The fiduciary's answer was technically accurate. However, the fiduciary knew, but did not inform the beneficiary, that the insurance could easily be "converted" into the type of individual policy the beneficiary desired. *Id.* at 750–51. The D.C. Circuit concluded that the fiduciary's silence was misleading and prevented the beneficiary from learning the truth about his coverage options.

■ This case is easily distinguishable from *Anweiler* and *Eddy*. Here, the plaintiffs were never misled about the terms of the EPP or prevented from learning about the requirements for obtaining benefits. In fact, when three of the plaintiffs asked Great Northern human resources department employees whether they would be entitled to their tin parachutes if they retired early, all three were told they would not qualify for EPP benefits. Those responses were certainly not misleading. A fourth plaintiff was referred to the plan. That response was likewise not misleading. In fact, given the circumstances of this case, that may have been the safest answer. After all, the human resources representative who referred that plaintiff to the plan was answering questions about Georgia–Pacific's retirement plan, not the EPP. He might have stirred up more trouble by speculating about the merits of an individual employee's EPP claim. Finally, we note that taking early retirement does not necessarily preclude an employee from receiving EPP benefits. For example, had the plaintiffs experienced a job transfer or a reduction in authority before December 31, 1990, taking early retirement would not have affected their ability to receive EPP benefits. With that fact in mind, the plaintiffs are essentially arguing that Great Northern and Georgia–Pacific should have reviewed their individual situations and then warned them that early retirement would bar them from receiving EPP benefits. ERISA does not require plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands of

employees. *See Cummings v. Briggs & Stratton,* 797 F.2d 383, 387 (7th Cir.), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 703 (1986); *accord Childers v. Northwest Airlines, Inc.,* 688 F.Supp. 1357, 1361 (D.Minn.1988) (stating that ERISA "does not impose a fiduciary duty to provide individualized notice of the effect a particular event may have on a participant or beneficiary's eligibility to receive benefits"). For these reasons, the district court's decision to grant summary judgment for the defendants on the breach of fiduciary duty claims was kosher.

One issue remains. The district court first found that although the plaintiffs' claims for benefits were ultimately unsuccessful, they brought their lawsuit in good faith and were entitled to recover their attorney fees under section F of the EPP. However, the court later found that because the plaintiffs had a contingent fee agreement with their lawyers, they never incurred legal fees. The plaintiffs claim the district court overlooked a small sum they paid their attorneys before the contingent fee agreement was signed. Georgia–Pacific contends that these fees were incurred in prelitigation consultations and are not recoverable.

We find that the plaintiffs are entitled to the $2,249.08 they paid their attorneys to review their claims before filing suit. Section F of the EPP was designed to force the company to pay when an employee is able to make a good-faith claim that benefits were improperly denied. Nothing in that provision limits the recovery of legal fees to those incurred after a complaint is filed. Rather, the EPP expressly provides for all reasonable legal fees incurred seeking to obtain benefits offered under the plan. As a result, we find the plaintiffs actually incurred recoverable legal fees in the amount of $2,249.08.

In sum, the judgment of the district court on the ERISA claims is AFFIRMED. This resolves the guts of the case. The part of the judgment holding that the plaintiffs could not recover any legal fees is REVERSED and REMANDED for entry of a new judgment awarding the plaintiffs attorney fees in the amount of $2,249.08. Each side must bear its own costs on the appeal.