USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1286

 JANE DOE,

 Plaintiff, Appellee,

 v.

 TRAVELERS INSURANCE COMPANY,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert E. Keeton, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Aldrich, Senior Circuit Judge,
 
 Boudin, Circuit Judge.
 
 

 Joan O. Vorster with whom James C. Donnelly, Jr., Charles B.
Straus, III, and Mirick, O'Connell, DeMallie & Lougee, LLP were on
brief for appellant
 Katherine A. Hesse with whom David W. Healey, Doris R.
MacKenzie Ehrens and Murphy, Hesse, Toomey & Lehane were on brief
for appellee.

January 27, 1999

 
 BOUDIN, Circuit Judge. Travelers Insurance Company
("Travelers") appeals from a judgment against it in favor of Jane
Doe (a pseudonym) for claims she brought in the district court
under the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. 1001, et seq. The events giving rise to
Doe's law suit and the proceedings that ensued can be briefly
summarized as follows.
 In 1995, Jane Doe was the founder, chairperson and chief
technical officer of a high tech firm. During the prior two years,
she had been getting outpatient psychotherapy for depression. In
January 1995, she attended a women's retreat where, she later said,
she experienced a rush of repressed memories of childhood sexual
abuse. Following this experience, Doe was afflicted by an
increased sense of disquiet and depression, had trouble sleeping
and eating, and suffered from repeated sudden floods of images and
memories.
 According to her medical records, Doe engaged in some
self-destructive behavior between the retreat and the end of
February. Once she wandered off into the snow for several hours at
night. She overdosed on codeine at one point, had urges to cut
herself, and formed some thoughts of suicide (the clinical phrase
is "suicidal ideation") centering upon codeine overdosing. Her
depression grew more severe during late February. On March 1, Doe
nearly had an automobile accident when she had a "flashback" while
driving at high speed.
 At the urging of her psychiatrist, Dr. Nicholson
Browning, Doe contacted the Human Resource Institute Hospital on
February 23, 1995, with a view to possible hospitalization. Doe's
company had an employee benefit health plan that comprised or
included medical coverage under a policy issued by Travelers. The
Travelers policy included inpatient hospital care for mental health
needs, where justified under the policy, for up to 60 days subject
to a 20 percent co-payment by the beneficiary. Apparently there
followed some discussion between the hospital and Travelers that
led Doe to believe that Travelers would likely cover her
hospitalization and that the hospital would waive Doe's share.
 On March 1, 1995, Doe asked Travelers to approve her
admission to the hospital, which she entered on March 2. A three-
page single spaced "admission note," compiled by Dr. Lisa Wolfe,
the psychologist involved in Doe's care, concluded in "reason for
hospitalization": "Deteriorating condition unmanageable outside of
a hospital setting and serious suicide risk." Doe's treating
psychiatrist, Dr. Nan Herron, also said that inpatient care was
necessary and later supplied hospital notes covering the first
several weeks of March that referred to suicidal gestures and
impulses on Doe's part.
 On March 3, a Travelers' representative acting as
"patient advocate" advised Doe's doctors orally that Travelers
would not approve inpatient treatment. The internal notes of the
patient advocate indicate as reasons that there had been no
suicidal ideation since Doe's hospitalization (a one-day period)
and that she had been willing to "contract" for her safety with the
hospital--apparently a commitment secured by the hospital from
patients where possible--and that she had been admitted to an
"open" unit subject to checks by hospital staff only every 15
minutes--as opposed to close confinement or more frequent
monitoring. 
 Doe remained in the hospital, paying out of her own
pocket but insisting that Travelers reimburse her. Doe's doctors
and psychologist wrote to Travelers and supplied more details and
arguments for reimbursement. Travelers' patient advocate and a
series of other Travelers personnel wrote letters in reply and
consulted with physician advisors and medical reviewers who advised
Travelers based on records as to Doe; the gist of these statements
was that Doe's symptoms and the hospital's willingness to let her
out of the hospital for brief daytime "leaves" showed that
outpatient treatment was a feasible and obviously less costly
alternative approach. The correspondence continued after Doe
completed her inpatient treatment on or about March 20.
 Ultimately, in May 1995, Travelers agreed to pay for the
first two days of hospital treatment but not the balance. After
further refusals of Travelers to pay more, Doe filed suit in a
Massachusetts state court against Travelers for breach of contract
and deceptive acts and practices. Travelers removed the case to
federal district court where it has been treated, without dispute
by the parties to this appeal, as one governed directly by ERISA. 
See Doe v. Travelers Ins. Co., 971 F. Supp. 623, 629 (D. Mass.
1997). After discovery and a four-day non-jury trial, the district
court decided the case on July 31, 1997, in favor of Doe. See id.at 639-41.
 The district court concluded that Travelers' handling of
Doe's claim had been flawed by procedural errors and by Travelers'
improper delegation of authority to handle claims to other
entities; that Doe had at least a colorable case for reimbursement;
that reconsideration by Travelers was infeasible because it no
longer retained authority to decide claims; and that therefore Doe
should be reimbursed the amount of her unpaid hospitalization costs
of $23,456.04. See Travelers, 971 F. Supp. at 641. The court also
found that Travelers had violated ERISA by failing to supply Doe
with certain mental health guidelines it had used in considering
her claim and imposed $38,000 in penalties. See id. at 640.
 The district court also concluded that it should award
attorney's fees and costs in favor of Doe. See id. at 641. In
later proceedings, it fixed the amount at $155,705.92 in fees and
$1,264.70 in costs. Thereafter, a final judgment, which also
provided for post-judgment interest, was entered covering hospital
reimbursement, penalties, and attorney's fees and costs. Travelers
now appeals, challenging every portion of the judgment.
 It is common ground that Doe's rights against Travelers
under the policy are governed by ERISA and not by state law. See
id. at 629. Under ERISA, a plan beneficiary such as Doe may bring
a civil action "to recover benefits due" under the plan or to
enforce "rights" under the plan. 29 U.S.C. 1132(a)(1)(B). 
Travelers concedes that under 29 U.S.C. 1002(21), it has assumed
a fiduciary responsibility to pay benefits due under the policy. 
See Travelers, 971 F. Supp. at 629. The first question we face is
whether Doe is entitled to reimbursement under the policy in this
case.
 What is "due" to Doe under the policy is, in the first
instance, defined by the terms of the policy. Under the policy,
Doe is covered for hospitalization of the type in question--it is
listed as one of the treatments available--but only if it is
"medically necessary." The policy provides that Travelers
"determines, in its discretion, if a service or supply is medically
necessary," including consideration of whether "a less intensive"
treatment would accomplish the task. Later language says that
"[n]o benefits are payable unless the Patient Advocate determines
the services are Medically Necessary."
 Although the "discretion" and "no benefits" language
could be read literally to make Travelers' decision final,
Travelers quite sensibly does not take this extreme position. It
says only that it is entitled to have its own decision reviewed
deferentially, under an arbitrary and capricious standard, based on
the information it had available when it made its decision. At
first blush, the standard of review urged by Travelers is just what
the Supreme Court endorsed in Firestone Tire & Rubber Co. v. Bruch,
489 U.S. 101, 115 (1989), for ERISA benefit determinations where,
as here, the plan language purports to reserve to the defendant
discretion in administering the provisions in question.
 Firestone did note that where the plan fiduciary
exercising the discretion operates under "a conflict of interest,"
this is a "factor" in determining whether discretion has been
abused. Id. at 115. What constitutes a conflict and how the
factor is to be weighed were not explained, and naturally the cases
in the lower courts are now somewhat divided. Here, of course,
Travelers would pay the claim out of its own assets, a position the
district court viewed as producing a conflict of sorts. Travelers,
971 F. Supp. at 630. Travelers says it is a very small claim
payable out of very large assets; but small claims add up. On the
other hand, Travelers can hardly sell policies if it is too severe
in administering them.
 The district court predicted that this circuit would
adopt a standard for companies in Travelers' position that afforded
the company latitude but gave "more bite" to the arbitrary and
capricious standard, a notion suggested by a Seventh Circuit case. 
Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 815 (7th Cir.
1997). Thereafter, a panel of this court cited the "more bite"
language with approval but then glossed it in terms that would make
it inapplicable here. Doyle v. Paul Revere Life Ins. Co., 144 F.3d
181, 184 (1st Cir. 1998). Doyle stressed the benefit of a uniform
test of discretion and concluded that the mere fact that an
individual claim, if paid, would cost the decision maker something
did not show that "the decision was improperly motivated." Id.
 It seems to us that the requirement that Travelers'
decision be "reasonable" is the basic touchstone in a case of this
kind and that fine gradations in phrasing are as likely to
complicate as to refine the standard. The essential requirement of
reasonableness has substantial bite itself where, as here, we are
concerned with a specific treatment decision based on medical
criteria and not some broad issue of public policy. Any reviewing
court is going to be aware that in the large, payment of claims
costs Travelers money. At the same time, the policy amply warns
beneficiaries that Travelers retains reasonable discretion based on
medical considerations.
 Consistent with Doyle, 144 F.3d at 184, we do not think
that Travelers' general interest in conserving its resources is the
kind of conflict that warrants de novo review. Nor is it necessary
to consider Doe's position, reinforced by some comments of the
district judge, that de novo review is appropriate in this case--
apart from any alleged conflict of interest--because of other
procedural errors by Travelers or improper delegations of authority
by it to others. We by-pass these latter concerns by assuming that
review is merely for reasonableness and by concluding that even
under this favorable standard Travelers' denial of benefits, tested
against the relevant record, was unreasonable in this case. 
 This brings us to the question of what "record" should be
used in judging the reasonableness of Travelers' decision. It is
not clear that any single answer covers all of the variations in
ERISA cases; the "record" may depend on what has been decided, by
whom, based on what kind of information, and also on the standard
of review and the relief sought. Here, we will assume arguendo, in
Travelers' favor, that Travelers could sustain its denial if it
acted reasonably based on the information in its possession
available from Doe and from other sources, and that new previously
unavailable medical evidence from Doe offered for the first time at
trial would not impeach the original decision.
 Finding out just what information Travelers had and why
it acted as it did depends upon the medical notes provided to it,
the exchange of correspondence, and the recollections of oral
conversations; this in turn can require discovery and even fact
finding by the district court. Here, however, the parties have
stipulated to, or otherwise left undisputed, facts or documents
sufficient to resolve the case. Doe continued to pursue her case
administratively well into the summer, and Travelers gives us no
reason to ignore information Doe offered to Travelers before her
last appeal was rejected in August 1995.
 The district court opinion describes, chronologically,
much of the back and forth in March 1995 and thereafter, and quotes
at length from the medical log of Travelers' patient advocate. 
Instead of repeating the story in the same detail and manner, we
extract the essentials on each side and consider them, in
particular, against the more general criteria of the mental health
"guidelines" on which Travelers itself said it relied in making its
decision.
 On Doe's side of the scale, it is evident that Doe was
significantly anxious and depressed before entering the hospital. 
This claim of mental disturbance is plausibly explained by Doe's
prior history, and was confirmed by her outside psychiatrist and by
the medical staff at the hospital after she entered. Her records
indicate a downward trend in her condition in late February 1995. 
Doe's own doctor urged her to seek hospital care. Nonetheless, if
this evidence stood alone, Travelers might have had reason to
insist that Doe first exhaust the possibility of outpatient
treatment.
 The gravamen of Doe's claim is the danger of suicide--
that she had engaged in some self-destructive behavior and had both
before entering the hospital and afterwards, some thoughts about
self-mutilation and suicide. Here, we deal with matters of degree:
she had not leapt from a balcony or tried to shoot herself, and
there is no clear evidence that she had the kind of very detailed
and consistent plans for suicide that would cause the most severe
level of alarm. At the same time, her documented impulsiveness
certainly created a danger, even if more qualified than a well-
developed plan, that she might harm herself in a wave of dispair or
distraction.
 It is much harder to calibrate such risks than to
diagnose conditions that can be reduced to blood samples, EKG
print-outs, or biopsies--and that, in turn, requires that we give
special weight to the judgment of trained experts who saw and
treated Doe. The opinions of her own doctor, the hospital doctor,
and the hospital psychologist were unanimous that Doe did have
suicidal thoughts, that they created a discernible risk that she
would act on them, and that a period of inpatient care was
necessary. The hospital notes for most of the period of Doe's
hospitalization continue to reflect concerns about suicide or self
harm. A significant risk of death is, of course, the ultimate
medical danger.
 On Travelers' side of the balance, it appears that the
patient advocate did confer with one or more of Travelers' own
consulting psychiatrists, who concurred in the advocate's denial of
approval. However, Travelers' doctors did not examine Doe, their
reasoning is not known in detail, and Travelers eventually conceded
that cause existed to justify two days of inpatient evaluation, an
evaluation that led the hospital to continue to press for inpatient
care. The only objective evidence cited by Travelers is that Doe's
confinement within the hospital was less severe than it might have
been and that she was allowed out for portions of some days "on
leave"; but these choices were necessarily based on judgments as to
Doe's day-to-day condition.
 The written mental health guidelines that Travelers
purported to rely upon come very close to embracing the facts of
this case. Two separately sufficient conditions for acute
inpatient care are: "recent suicide attempt and/or serious gesture
with specific plan--and means indicating current suicidal risk" and
"[c]urrent suicidal ideation and plan with a history of previous
suicide attempts, serious gestures . . . ." Either of this pair of
conditions constitutes "severe" impairment and justifies inpatient
hospitalization. The guidelines go on to make clear that even
"moderately severe" or "moderate" impairment (e.g., "history of
[suicidal] gestures and/or attempts with or without a specific
plan") can justify inpatient treatment depending on the
circumstances.
 Given the stakes, the objective evidence of Doe's
"gestures," her plausible persistent claims of suicidal thoughts
(accepted as authentic by her doctors), her undoubtedly fragile
mental condition, the unanimity of expert opinion on the part of
those who examined and treated Doe that inpatient care was
required, and Travelers' own guidelines, we think that the denial
of full benefits was unreasonable. This conclusion eliminates any
concern about procedural flaws, delegations, remands or
abandonment of authority to revisit the case. Travelers is simply
responsible under the policy for the treatment as "medically
necessary." 
 By contrast, we do not agree that Travelers--by failing
to tender to Doe a copy of the mental health guidelines--violated
ERISA's requirement that any plan administrator must furnish, on
request and within 30 days, "any information which such
administrator is required by [ERISA] to furnish to a participant or
beneficiary . . . ." 29 U.S.C. 1132(c). The district court
said that Doe had requested the guidelines by letter of June 21,
1995, that the guidelines fell within the category of information
that a plan administrator is required by statute to furnish on
request within 30 days, and that Travelers had not furnished the
guidelines to Doe until discovery in this case on August 6, 1996. 
See Travelers, 971 F. Supp. at 639-40. The court therefore imposed
the section's discretionary penalty of $100 per day for failure to
comply starting 30 days after July 22, 1995, or $38,000. See id.at 640-41.
 As background to the legal issue, some additional facts
are pertinent. The first letter from Travelers to Doe, dated March
7, 1995, said inter alia that the initial denial of inpatient
treatment was made "[p]ursuant to the Travelers' Medical Necessity
Guidelines" because the patient's "clinical situation" showed that
treatment could be rendered in "a less intrusive or more
appropriate alternative setting." Later, more detailed
correspondence from Travelers dealt with clinical information
concerning Doe but did not refer again to any specific guidelines.
 In the course of discovery, Travelers was forced to
produce the document titled "Guidelines for Level of Care Decisions
in Mental Health Care," see note 5, above, saying that this was the
"Travelers' Medical Necessity Guidelines" to which its original
March 7 letter referred. The document would likely have been quite
helpful to Doe and her doctors in arguing for inpatient treatment,
but the document itself cautions that treatment decisions depend
upon "many factors, only some of which can be generalized in the
form presented here."
 This brings us back to the statute and regulations. 
Section 1024 requires that the administrator furnish each
beneficiary, at the outset and later upon request, the summary plan
description and, upon request, "the trust agreement, contract or
other instruments under which the plan is established or operated." 
29 U.S.C. 1024(b)(2). Elsewhere, the statute says that "the plan
description and summary plan description" shall include inter alia"the plan's requirements respecting eligibility for participation
and benefits" and "circumstances which may result in
disqualification, ineligibility, or denial or loss of benefits." 
29 U.S.C. 1022(b). See also 29 C.F.R. 2520.102-3(l); 29 C.F.R.
 2520.102-3(j)(2).
 We do not think that the mental health guidelines are one
of the "other instruments," a phrase that in context refers to the
formal legal documents that underpin the plan. And while the
statute's "requirements" and "circumstances" language might be
stretched to cover the document, this language is more reasonably
directed to provisions such as those contained in the policy itself
that describe the plan and legally obligate Travelers--with respect
to the medical conditions covered, these provisions include the
general test of medical necessity, the claims procedure, and like
information that a beneficiary would normally consult in
determining what protection was afforded by a plan. See Faircloth,
91 F.3d at 653-54; Hughes, 72 F.3d at 690-91.
 The mental health guidelines may have been used by
Travelers, but Travelers was not bound to use them, nor did
patients have any legal rights under them. Travelers could consult
or disregard this or any other set of mental health guidelines,
medical textbooks, articles, or advisors in making its judgment. 
To hold that Travelers' choices, from this broad and changeable
menu, become part of the plan stretches the statutory language too
far. The courts have understandably been cautious in reading too
broadly disclosure requirements whose violation can trigger a $100
per day penalty, conceivably available to many plan participants
and beneficiaries.
 The district court also relied upon a provision, not of
ERISA but of the regulations under it, relating to claim
procedures. See Travelers, 971 F. Supp. at 632. This regulation
requires every plan to have a procedure for appealing a denied
claim to a fiduciary or its delegate and "under which a full and
fair review" may be obtained, including the opportunity to "review
pertinent documents." 29 C.F.R. 2560.503-1(g). The district
court ruled that Doe's June 21, 1995, letter--asking for "a copy of
the medical reviewers['] report" --was a "request" for the mental
health guidelines and triggered Travelers' duty to produce the
guidelines as a "pertinent" document needed for "full and fair
review."
 We pass by the question whether ERISA's $100 penalty
provision applies to material required solely because of an ERISA
regulation (section 1132(c)(1) speaks of information required "by"
the statute). Even if the penalty provision did apply in
principle--a debatable issue--a request for "the medical
reviewers['] report" is not a request for the guidelines. Nor do
we think that Doe's general request for an explanation required the
production of the guidelines as an essential part of Travelers'
obligation to supply an extension for its decision under 29 C.F.R.
 2560.503-1(f).
 This does not mean that the failure to provide "a full
and fair review" required by the regulations is without
consequences or that no "pertinent document" need ever be produced
for such a review without a specific reference. The district court
thought the denial of Doe's claim flawed by just such missteps in
this case--an issue we have found it unnecessary to reach. SeeTravelers, 971 F. Supp. at 632-34. Similarly, the regulations can
be enforced by the Secretary. See 29 U.S.C. 1132(a)(2), (a)(4-
6). But the $100 per day penalty is limited to those cases where
the conduct falls squarely within the terms of section 1132(c). 
See Verkuilen, 122 F.3d at 412; Anderson, 47 F.3d at 248; Groves,
803 F.2d at 117-19. 
 Finally, we turn to Travelers' appeal from the award of
attorney's fees against it. Under ERISA, the district court "in
its discretion may allow a reasonable attorney's fee and costs" to
either party (the award is mandatory only in a narrow and here
irrelevant class of cases). 29 U.S.C. 1132(g)(1); see also Lodgev. Shell Oil Co., 747 F.2d 16, 20-21 (1st Cir. 1984). Naturally,
such awards are normally for the prevailing party, if at all, and
are based on rather general considerations such as fault, ability
to pay, deterrence, and the like. See Gray v. New England Tel. and
Tel. Co., 792 F.2d 251, 257-58 (1st Cir. 1986). In this case the
district court wrote a thoughtful separate opinion explaining its
reasons for awarding fees in favor of Doe.
 Nevertheless, we must remand the award of attorney's fees
because the amount allowed rested in part on the size of the award
to Doe, and we have now struck the penalty component of the award. 
If anything in our opinion prompts the district court to reconsider
whether any award should be made, it is free to do so. But we do
not suggest that the district court needs to conduct any further
proceedings before deciding these issues.
 The award of hospitalization benefits including pre-and
post-judgment interest is affirmed; the award of penalties for
nondisclosure is reversed; and the award of attorney's fees and
costs is vacated and remanded for further proceedings consistent
with this opinion. Each party shall bear its own costs on this
appeal, and Doe's request for attorney's fees on this appeal is
denied.
 It is so ordered.