Faith WILCZYNSKI, Plaintiff–
Appellant,

v.

KEMPER NATIONAL INSURANCE
COMPANIES, Defendant–
Appellee.

No. 98–1942.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1998.

Decided May 26, 1999.

**934**

Mark D. DeBofsky (argued), DeBofsky & DeBofsky, Chicago, IL, for Plaintiff–Appellant.

Paul R. Garry (argued), Bates, Meckler, Bulger & Tilson, John F. Zabriskie, Hopkins & Sutter, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

For nearly two years, Faith Wilczynski collected long-term disability benefits from Kemper Insurance, her former employer, because her medical condition rendered her unable to work. When her benefits were terminated on the ground that she was no longer disabled, Wilczynski failed to return to work and in due course was discharged from Kemper's employ. Wilczynski filed suit under the Employee Retirement Income Security Act (ERISA), see 29 U.S.C. § 1132(a)(1)(B), challenging Kemper's termination of her disability benefits and its further decision to deny her continued health insurance coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA), see 29 U.S.C. § 1161 et seq. The district court dismissed Wilczynski's complaint for failure to exhaust administrative remedies, but on appeal we reversed and remanded the case for trial. See Wilczynski v. Lumbermens Mutual Casualty Co., 93 F.3d 397 (7th Cir.1996). Following a bench trial, the district court entered judgment in favor of Kemper and against Wilczynski both on her disability benefit claim and on her COBRA claim. Wilczynski brings this successive appeal and we affirm.

*Standard of Review*

We review *de novo* a plan administrator's denial of benefits under § 1132(a)(1)(B) "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1008–09 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1113, 143 L.Ed.2d 109 (1999). Where a plan confers discretionary power on the plan administrator, the deferential "arbitrary and capricious" standard governs. *See id.* at 1008; *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir.1998). In the present case, the district court applied the arbitrary and capricious standard citing language from the Kemper Plan which it construed as conferring discretion. *See Wilczynski v. Kemper Nat. Ins. Cos.*, 998 F.Supp. 931, 942 (N.D.Ill.1998). The representations of the parties before this Court lead us to believe that the district court was relying on the Summary Plan Description, rather than the Plan itself, to confer discretion.[1] The Plan does not contain the language quoted by the district court nor any comparable language that might justify the arbitrary and capricious standard of review.[2] Thus, applying the

---

1. On December 4, 1998, the parties were ordered to inform the Court which of the two documents in question is the operative plan in this case. On December 7, 1998, the parties entered a joint stipulation designating the Kemper National Insurance Company's Long Term Disability Plan, dated 1988, which appears as Def.'s Ex. 1. The Summary Plan Description, dated 1990, appears as Pl.'s Ex. 1.

2. We are not convinced that the language of the Summary Plan Description—on which the district court relied—was sufficient to vest Kemper with discretionary authority. It reads: "A claim form provided by the Compa-

*de novo* standard of review (which may be appropriate), the issue is whether Kemper was correct in deciding to terminate Wilczynski's disability benefits. *See Karr v. National Asbestos Workers Pension Fund,* 150 F.3d 812, 814 (7th Cir.1998); *Gallo v. Amoco Corp.,* 102 F.3d 918, 921 (7th Cir. 1996), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). As it turns out, ironing out this wrinkle over the standard of review is not a practical imperative for we find that Kemper's termination of Wilczynski's benefits was justified even under the less deferential *de novo* standard.

*Termination of Disability Benefits*

On April 30, 1990, Wilczynski commenced employment as a manager in Kemper's Commercial Line Support Unit (CLSU). Her job involved the supervision of about 40 employees—raters, typists, coders and file personnel—in underwriting insurance for commercial entities. At trial, Wilczynski testified that her supervisory duties and the need to meet strict deadlines made the job stressful. Roughly half of Wilczynski's typical working day was spent sitting at a desk and the other half either walking or standing.[3]

In March 1987, Wilczynski had been diagnosed with multiple sclerosis (MS). About five months into the job at Kemper, she was hospitalized briefly for a kidney infection. Wilczynski testified that after hospitalization, she encountered physical problems that she associated with MS, including fatigue, lack of strength and loss of balance. She informed Kemper that she suffered from MS and that her work hours would have to be reduced. Following discussions with her supervisor, Frank Kobel, and Kemper's human resources department, it was agreed that Wilczynski would work on a flex-time schedule. For the next ten months, Wilczynski worked an average of five to six hours a day, varying her schedule to accommodate the ups and downs of her condition. Kobel testified that Wilczynski's duties remained essentially the same but that her work was limited to what she could accomplish during her restricted hours.[4] Wilczynski testified that she was paid full salary only for

ny must be completed and returned to the employee group claim department prior to receiving any benefit payment under the Plan" and "the Company may require confirmation of a continuing disability at reasonable intervals through submission of a new form." *See* Pl.'s Ex. 1. The Summary Plan description also states that independent examinations may be required to determine the validity of a claim. While we have previously stated that "no magic words are required to confer discretion on an administrator," *Chojnacki v. Georgia–Pacific Corp.,* 108 F.3d 810, 815 (7th Cir.1997), we have also recognized that, at a minimum, discretion implies some leeway to decide what constitutes total disability. *See Ramsey v. Hercules, Inc.,* 77 F.3d 199, 205 (7th Cir.1996). Thus, we have applied the arbitrary and capricious standard of review where the plan language permits some measure of subjective decision-making. *See, e.g., Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (7th Cir.1995) (plan stated that benefits would be payable only upon receipt "of such notice and such due proof, as shall be from time to time required, of such disability"); *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 379 (7th Cir.1994) (plan provided for the payment of benefits "upon receipt of proof"

and stated that "[a]ll proof must be satisfactory to [the administrator]"). The language relied upon by the district court in the present case contains no comparable words or phrases. We do not believe that it can be construed as conferring discretionary authority on Kemper, as plan administrator.

3. Wilczynski testified at trial that most of her time on the job was spent walking or standing. An occupational planning and analysis worksheet of her job—completed by her supervisor, Frank Kobel, in November 1991—stated the job required 60 percent sitting and 30 percent standing. It is undisputed that Wilczynski had to move back and forth between employees who were located on two different floors and that frequently she had to carry files between locations.

4. Kobel testified that in April 1991 he had a meeting with a human resources representative, as well as several follow-up meetings with Wilczynski, with a view to clarifying her job description and performance standards under her flex-time schedule. The record contains copies of Kobel's handwritten notes of these meetings.

the hours she actually worked and was evaluated on the basis of what she achieved during that time. For the remaining hours, she received the short-term disability rate of two-thirds pay.[5]

In July 1991, when her medical troubles intensified due to complications with a pregnancy, Wilczynski ceased working altogether and was placed on disability leave. At the end of October 1991, she began receiving long-term disability benefits in the amount of $2,030 per month. After the birth of her child on February 29, 1992, her disability status was extended due to the progression of her MS. Wilczynski testified that during this time her condition induced multiple physical ailments: overwhelming fatigue, lack of stamina and strength, problems with balance, heat intolerance, numbness, vision impairment and urinary incontinence. She testified that in any given month she would have five or six bad days when she would suffer one or more of these symptoms. On those days, she had difficulty dealing with her children and required assistance at home. The rest of the time, she was troubled only by residual symptoms and, for the most part, could function normally. Wilczynski testified that the condition was inconsistent and that she could not predict how she would fare from one day to the next. During the relevant time-period, she took certain prescribed medications with varying degrees of success.

Under Kemper's Long Term Disability Plan, an employee is eligible to receive benefits after a 13–week elimination period. For an initial period of 24 months, the employee is entitled to benefits if she is "unable to perform each of the material and substantial duties of [her] work with [Kemper]" (occupational disability clause). Once the 24–month threshold has been crossed, however, the payment of benefits is premised on a showing that the employee is "unable to perform each of the material and substantial duties of any employment for which [she] is reasonably fitted by education, training or experience" (general disability clause). As a prerequisite to the receipt of benefits, an employee is required to provide periodic certification of her disability and to undergo independent medical examinations.[6]

Between April 1992 and December 1993, no less than eight medical experts were enlisted to assess the impact of MS on Wilczynski's ability to work. The chronology is roughly as follows. In April 1992, Dr. Timothy Martin, Wilczynski's treating physician, certified that she was unable to work due to MS. On September 21, 1992, an independent medical examination was conducted by neurologist Dr. Daniel Hier. On the basis of an interview, a brief physical examination, and the results of tests previously conducted, Hier reported that the diagnosis of MS was uncertain and that he did not believe Wilczynski to be disabled.[7] At trial, Wilczynski complained that Hier's examination had been short, interrupted and incomplete. With the benefit of Hier's opinion, Martin subsequently retracted his earlier diagnosis.

Wilczynski then enlisted a new treating physician, Dr. Richard Geiger, who examined her on two occasions in September 1992 and certified her disability. On January 9, 1993, Geiger—a family practitioner—informed Kemper that he did not believe Wilczynski was capable of carrying out her job duties in a full-time office setting but recommended referral to a neurologist for future disability evaluations. Wilczynski subsequently saw neurologists Dr. David Markovitz and Dr. Marvin Zelkowitz who certified her as dis-

**5.** Kobel testified that Wilczynski received her full salary while working reduced hours.

**6.** *See* Def.'s Ex. 1 at 3.

**7.** Hier opined that Wilczynski's primary complaint of fatigue did not correlate with a nor-

mal brain MRI that had been obtained on April 9, 1992. He suggested, however, that the results of further tests—visual evoked responses and a lumbar puncture—might shed light on the nature of her diagnosis and recommended a psychiatric evaluation.

abled due to MS on February 8, 1993 and May 28, 1993, respectively. Neither Markovitz nor Zelkowitz submitted a report to Kemper or responded to Kemper's requests for comments. In the meantime, on January 5, 1993, a second independent examination was conducted by another neurologist, Dr. Bruce Cohen. Cohen submitted a lengthy report based on his examination of Wilczynski and review of her medical records. He opined that Wilczynski's residual disability was mild and that her major neurological limitation was her inability to sustain cognitive and physical activity for an extended period of time. In Cohen's view, Wilczynski was capable of reduced but continued occupational activity with adequate adjustment of her work environment, such as interspersing rest periods throughout the day and reducing the amount of time spent on her feet.[8]

On April 22, 1993, Wilczynski nominated a third treating physician, Dr. Alexander Kloman, to certify her disability. Kloman examined Wilczynski only once—on April 20, 1993—but communicated with her by telephone on several subsequent occasions. Kloman sent several statements to Kemper indicating that Wilczynski's MS rendered her unable to work. In a lengthy report dated November 9, 1993, Kloman outlined the clinical grounds that justified his diagnosis.[9] He concluded that Wilczynski was partially disabled from performing her previous job description but that she would be able to work—at her own speed and with administrative assistance—one or two days per week in the office and the rest of the time at home. Later that month, however, Kloman submitted a functional capacities form in which he estimated that Wilczynski could work part-time for up to five hours a day with rest intervals. On September 7, 1993 a third independent examination was conducted by yet another neurologist, Dr. Michael Wasserman, who submitted a report to Kemper on November 17, 1993. Wasserman concluded that the diagnosis of MS was marginal at best and that the objective evidence of the disease was barely present. In his view, Wilczynski could carry out her job functions [10] but he recommended starting her part-time and gradually increasing her hours.

■ On December 2, 1993, Kemper terminated Wilczynski's benefits, retroactive to September 6, 1993, on the ground that she was no longer totally disabled. The decision to terminate Wilczynski's benefits was based primarily on medical evidence. At some point during the relevant timeframe, each of Wilczynski's five treating physicians certified that she was disabled and unable to work. However, one (Martin) later reversed his opinion, a second (Kloman) modified his diagnosis to partial disability, while a third (Geiger) identified a need for expert evaluation. Neither of the two remaining physicians (Markovitz and Zelkowitz) reported their findings in full. The three independent physicians who examined Wilczynski (Hier, Cohen and Wasserman) each determined that she was not totally disabled. Thus, the overall

---

8. The only objective findings of MS detected by Cohen were an alteration in sensory perception and an increased stance displayed on ambulation. Cohen did not consider that a normal MRI excluded the diagnosis of MS. He noted that the nature of her illness rendered her recovery potential indeterminate. As regards her job description, Cohen concluded that Wilczynski was capable of performing all of her previous work activities but suggested exploring options to ease the physical demands of her work, including the possibility of transferring some of her duties, such as documentation and report preparation, to her home.

9. Having reviewed Wilczynski's condition, symptoms and physical findings, Kloman concluded that there was no uncertainty regarding the diagnosis of MS and that her disability was not likely to abate.

10. Wasserman stated that Wilczynski could easily sit for eight hours a day, stand for one hour a day, walk short distances, carry light weights frequently and heavier weights occasionally. He advised against changes in temperature and humidity, activities involving balance and the use of automotive equipment.

tenor of the medical evidence points to the conclusion that Wilczynski was capable of returning to work—albeit subject to certain limitations.

Wilczynski argues that the opinions of her treating physicians, including Kloman, should control. But Cohen and Wasserman—whose opinions were cited as grounds for terminating Wilczynski's benefits—had sufficient experience and expertise to justify Kemper's reliance on their assessments. See Hightshue, 135 F.3d at 1148.[11] Moreover, the views of her treating physicians were far from consistent. It is undisputed that at the time Wilczynski's benefits were terminated two of her treating physicians—Kloman included—had expressed the view that she was capable of working at least on a part-time basis. The district court placed particular emphasis on the testimony of Wasserman; he was the physician who had conducted the most recent examination and the court found his testimony credible. But although the other experts generally took a less optimistic view of Wilczynski's condition and work capacities, it is fair to say that most of the medical evidence pointed in the same direction—away from total disability. Wilczynski contends that both Kemper and the district court overlooked or underestimated certain aspects of her

condition, notably, fatigue, gait disturbance, urinary incontinence and susceptibility to stress. But our review of the record suggests that these factors were adequately documented in the various medical reports—principally those of Cohen, Kloman and Wasserman—and, specifically, that fatigue and stress were taken into account in estimating her work capabilities.

Since Wilczynski had been receiving benefits for less than 24 months, the decision to terminate her benefits was based on a finding that she was no longer eligible under the Plan's occupational disability clause. In other words, Kemper reasoned that Wilczynski was capable of carrying out her former duties under her flex-time work schedule.[12] In fact, Wilczynski's previous position—CLSU manager—had been eliminated in October 1991. But, as the district court pointed out, Wilczynski's ability to perform her previous job duties as CLSU manager remained the yardstick for determining her eligibility for benefits under the occupational disability clause.[13] In evaluating Wilczynski's disability, the independent medical experts were asked to assess her ability to perform her previous job as described in detail in the CLSU manager job description and Kloman tendered his assessment on the same basis.[14]

11. Cohen, who was selected by the medical consulting agency Crawford & Co., was a neurologist at Northwestern Memorial Hospital. Another agency, Ellis & Associates selected Wasserman, a board-certified neurologist.

12. Wilczynski disputes the contention that, prior to her disability leave, Kemper had been willing to accommodate her flex-time schedule indefinitely. She testified that at the end of 1990, Kobel had warned her that she could lose her job if she did not resume full-time hours. Kobel testified that he had meant only that she should devote herself "full-time" to her duties during the time she was in the office. Wilczynski continued on her flex-time schedule—apparently without objection from Kemper—until she took disability leave in July 1991.

13. When her position was eliminated, Kobel wrote to Wilczynski and informed her that an

alternative rating position was available. Kobel testified that in a telephone conversation, Wilczynski had told him that she doubted that her physician would allow her to take up the position. He testified further that the position was held open for Wilczynski for about three to four months.

14. Wilczynski argues that the district court erred in striking the trial testimony of Leigh Moxley, a vocational rehabilitation consultant. Moxley compiled a report on Wilczynski's employability dated December 9, 1996. Because Kemper did not consider any such evidence in reaching its decision, we will not disturb the district court's evidentiary ruling. See Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 (7th Cir.1994) (even in a de novo review of the plan administrator's factual determinations, the district court may limit the evidence to the record before the plan administrator or permit the introduction of additional evidence).

At trial, Wilczynski testified that she did not believe that she could have resumed her old job either on a full-time schedule or on a regular part-time schedule. Similarly, she discounted the possibility of her performing *any* job on a full-time or regular basis. The reason, she explained, was that the inconsistency of her medical condition made it impossible for her to predict when she would have bad days. But Wilczynski also testified that on average she experienced only five or six bad days a month. And on cross-examination, she conceded that under her prior work regime, Kemper had allowed her to leave work when fatigued and to pace herself to accommodate her medical needs.[15] Thus, Wilczynski's own testimony seems to seal the fate of her claim.

In summary, there is ample evidence to support Kemper's contention that Wilczynski could have performed her previous position on a flex-time schedule—the benchmark for determining her eligibility for benefits—notwithstanding the vagaries of her condition.[16] We note that both Wilczynski and Kobel testified that her job was stressful. And we recognize that the indeterminate nature of Wilczynski's condition made it difficult to predict how well she would cope. It is implicit even in the opinions of the physicians who thought Wilczynski fit for work that she might encounter difficulties on her return to the workplace. But, on the basis of Wilczynski's prior experience on a flex-time schedule, we have no reason to doubt that Kemper was willing to make reasonable accommodations to meet her needs.

We believe that there was sufficient support for Kemper's determination that Wilczynski was able to resume her flex-time schedule and was therefore no longer totally disabled. We are mindful also that Kemper did not rush to judgment but rather provided Wilczynski with an opportunity to contest the decision through two levels of review. In the circumstances, we believe that Kemper's decision to terminate her benefits was lawful.[17]

### Denial of COBRA Coverage

■ Following the termination of her employment, Wilczynski received a notice that she was entitled to continue her health insurance at her own expense under the COBRA amendments to ERISA. *See* 29 U.S.C. § 1161 *et seq.* The notice, dated March 21, 1994, informed her that she had until May 20, 1994 to elect in writing to take up COBRA coverage.[18] Wilczynski concedes that she was aware of the deadline—she was pregnant at the time and

---

15. On cross-examination, Wilczynski initially denied that Kemper had allowed her to work at her own pace. However, on having her deposition read back to her, she conceded that, from November 1990 to July 1991, she worked restricted hours and was pacing herself.

16. In terminating her benefits, Kemper also reasoned that Wilczynski was capable of performing "any employment for which [she was] reasonably fitted" under the general disability clause. By October 1993, Wilczynski would have been receiving benefits for two years and the general disability clause would have become the benchmark for evaluating her disability. During her disability leave, Wilczynski had some general discussions with Kemper representatives about alternative job options, including the possibility of working at home. At trial, Wilczynski confirmed that in filing a discrimination charge with the EEOC she had stated that, as of January 3,

1994, she could have performed the duties of a claim adjuster or rater. Thus, although it is not necessary to determine the application of the general disability clause to her case, we note that Wilczynski would face an uphill battle in demonstrating that she was not capable of *any* suitable employment at Kemper.

17. In light of this conclusion, it is not necessary to consider Kemper's claim that Wilczynski failed to exhaust her administrative remedies.

18. Specifically, the notice stated: "[T]he enclosed election agreement must be completed, signed and sent to CobraServ within 60 days of the date coverage terminates or the date of the enclosed important notice (whichever is later). If a qualified beneficiary does not send this election within the 60–day time period allowed by law, the qualified beneficiary will lose rights to continue coverage." *See* Def.'s Ex. 18.

was anxious to extend her coverage. She testified that during the first week of May she gave the form to her husband to mail and that, to the best of her knowledge, he sent the form by ordinary mail.[19] She admitted that as a general practice she sent important documents by certified mail. When asked on direct examination why she had not returned the COBRA form sooner, Wilczynski explained that making her election in early May ensured continued coverage while maximizing her ability to make the necessary payments.

Wilczynski testified that on or about May 20, 1994, she called CobraServ and was told that there was no record of the receipt of her form but that applications often take time to work their way through the system. When Wilczynski called back at the beginning of June, CobraServ informed her that she had failed to elect coverage within the designated time-period. On cross-examination, Wilczynski conceded that, after the telephone conversation of May 20, she made no attempt to fax or telegraph a written notice confirming her election. Nor did she subsequently furnish CobraServ with confirmation of the mailing of her form, such as an affidavit from her husband.

Under COBRA, the qualified beneficiary must elect to receive continuation coverage within 60 days of the qualifying event or the date of notice of such event to the beneficiary, whichever is later. *See* 29 U.S.C. § 1165(1). It is clear that a timely written election was the only way Wilczynski could properly notify CobraServ that she was electing coverage. In rejecting Wilczynski's claim, the district court was struck by the fact that Wilczynski made no effort to fax or telegraph a written notice on the May 20 deadline, even though she was aware on that very day that her election form had not been received. We defer to the district court's assessment that Wilczynski's evidence was not credible or convincing. *See Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987, 991 (7th Cir.1998). Thus, we agree that Wilczynski failed to meet the requirements for election of continuation coverage.

A<small>FFIRMED</small>.

---

19. The plaintiff's husband, Paul Wilczynski, testified that he sent the letter by first class mail sometime between May 2 and May 10, 1994. Wilczynski argues that the district court erred in striking Paul's testimony (on the ground that the information had not been imparted to CobraServ). Because we take the view that the testimony adds nothing to Wilczynski's claim, we decline to pass judgment on the correctness of the district court's evidentiary ruling.