**Richard P. REINERTSEN and Reid Psychological Systems, an Illinois partnership, on behalf of the Reid Long Term Disability Benefit Plan, Plaintiffs,**

v.

**THE PAUL REVERE LIFE INSURANCE COMPANY, a Massachusetts corporation, Defendant.**

No. 99 C 6102.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 12, 2001.

Peter A. Silverman, Figliulo & Silverman, Chicago, IL, for plaintiff.

Michael Smith, Michael J. Smith & Assoc., Chicago, IL, for defendant.

### MEMORANDUM OPINION
### AND ORDER

KEYS, United States Magistrate Judge.

Before the Court are Plaintiffs Richard P. Reinertsen ("Mr.Reinertsen") and Reid

Psychological Systems ("Reid"), and Defendant The Paul Revere Insurance Company's ("Paul Revere") cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs allege that Paul Revere unreasonably denied Mr. Reinertsen's claim for disability benefits, as a residually disabled employee, contrary to the governing long-term disability insurance plan (the "Plan"), and the provisions and policies of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (3) (West 2000). Conversely, Paul Revere contends that its decision to deny Mr. Reinertsen's claim for residual disability benefits was proper, appropriate and legally justified. Because the Court finds that Mr. Reinertsen has not met, at this time, the conditions precedent for qualifying for residual disability benefits under the Plan, and for the reasons set forth below, the Court grants Paul Revere's Motion for Summary Judgment, and denies Plaintiffs' Motion for Summary Judgment.[1]

## BACKGROUND

The crux of this case is whether Paul Revere is legally justified in refusing to pay residual disability benefits to Mr. Reinertsen. This is an ERISA case, and all parties agree that the Plan at issue in this case is an ERISA plan,[2] that Paul Revere is both the fiduciary under the Plan and the insurer that contracted to provide Reid with long-term disability insurance for its employees, and that Mr. Reinertsen is a Plan employee.

Reid is an Illinois partnership in the business of developing and marketing pre-employment screening tools that assist employers in the hiring process. (Plaintiffs' Rule 56.1(a) Statement of Material Facts ("Pl.'s SMF") at ¶ 2; Defendant's LR56.1(a)(3) Statement of Material Facts

("Def.'s LR56.1") at ¶ 2.) Mr. Reinertsen began working for Reid in 1977, and, eventually, worked his way up to the position of Executive Vice–President of Sales by 1987. (Pl.'s SMF ¶ 8.) In April 1994, during his employment with Reid, Mr. Reinertsen suffered a severe subarachnoid brain hemorrhage, followed by a stroke on the right side of his body. (*Id.* at ¶ 9.) He was hospitalized for fourteen days in April and May 1994. (*Id.* at ¶ 8.) Although Mr. Reinertsen subsequently returned to work full-time by June 1994, according to Plaintiffs, it became increasingly apparent, over a period of time (Plaintiffs do not provide a date, however), that Mr. Reinertsen had been partially disabled by the hemorrhage and stroke, resulting in noticeable deficiencies in his work performance. (Pl.'S SMF ¶¶ 13–18.)

For instance, at the time of his stroke in 1994, Mr. Reinertsen held the position of Executive Vice–President of Sales, responsible for sales company-wide, with duties that included the supervision of approximately fifteen employees, extensive travel, giving sales presentations to and maintaining relationships with major clients, training the sales force, and general supervision of marketing. (Pl.'s SMF ¶ 10.) This top-level executive position requires both the mental and physical ability to travel extensively. (*Id.*) While, prior to his hemorrhage and stroke, Mr. Reinertsen was fully able to perform these tasks, after his illness, Mr. Reinertsen gradually began to experience problems with his memory and cognitive functioning, as well as other debilitating symptoms, which, according to Plaintiffs, made him unable to perform important duties of his job. (*Id.* at ¶ 11.) Specifically, Plaintiffs claim that Mr. Reinertsen's job performance has suffered from the following:

1. Paul Revere also has submitted a Motion to Strike Portions of the Declarations of Richard P. Reinertsen and Stephen M. Coffman, Tabs C–1 and C–2, and All Pleading References to Said Materials ("Motion to Strike"). As explained *supra,* the Court denies this Motion.

2. The Plan is an employee welfare benefit plan, governed by ERISA, as defined in 29 U.S.C. §§ 1002(1), 1003(a)(1). (Def.'s LR56.1 ¶ 4.)

(a) decreased ability to articulate his thoughts, including frequent groping for words and loss of his train of thoughts;

(b) continual fatigue and an appearance that he is in pain;

(c) reduced ability to engage in abstract thinking or to process and integrate complex information, frequently missing the key point or points;

(d) impaired memory;

(e) failure to display the wit and humor that characterized his personality prior to the stroke;

(f) great difficulty with conducting sales meetings and with subsequent support activities of professional follow-through, requiring duplication of efforts with other employees having to assist him in these tasks;

(g) difficulty in working with numbers; and

(h) pain and disorientation as a result of changes in air pressure experienced during frequent air travel required as part of his job.

(Pl.'s SMF ¶ 14.) Despite these performance deficiencies, Mr. Reinertsen has continued to work full-time since June 1994, and Reid, as his employer, has laudably tried to accommodate his health problems. Nonetheless, both Mr. Reinertsen and Reid acknowledge that, since the 1994 hemorrhage and stroke, Mr. Reinertsen, while working full-time, has been only half as productive in his position as Executive Vice–President of Sales as he was before the illness. (*Id.* at ¶ 13.) Consequently, starting in 1998, Reid reduced Mr. Reinertsen's responsibilities, and gave him a new position, as Executive Vice–President of Sales—Western Region, where only four to six sales or sales support employ-ees reported to him (as opposed to the fifteen employees who reported to him when he was responsible for sales company-wide). (*Id.* at ¶ 15.)

Despite these reduced responsibilities, Reid continued to find that Mr. Reinertsen was not able to satisfactorily perform all of the important duties and demands of his occupation. (Pl.'s SMF ¶ 16.) According to Reid, Mr. Reinertsen still continued to experience short and long term memory loss, was repeatedly absent due to recurring episodes of ill and unstable health, had a continuing inability to process complex information, had difficulties staying technically current, and lacked good business judgment. (*Id.*) As a result, Reid had to have other employees monitor and aid Mr. Reinertsen in the performance of his job. (*Id.*) Reid also explains that Mr. Reinertsen's decline in work performance is illustrated, in part, by a 35% fall in the Western Division sales figures in 1998, from $5,728,000 in 1997 to $3,702,000 in 1998. (By comparison, revenues for the Eastern Division—for which Mr. Reinertsen was not responsible—increased by 21% in 1998.)[3] (Id. at ¶ 17.)

Furthermore, because of Mr. Reinertsen's diminished capacity, and his consequent lack of productivity, Reid maintains that it reduced Mr. Reinertsen's compensation by at least 50% (although Plaintiffs do not provide a date as to when this occurred). Significantly, however, Reid admittedly continued to pay Mr. Reinertsen the same compensation as before his illness, claiming that Mr. Reinertsen only "earned" 50% for his reduced work capacity, and that the remaining 50% constituted "special pay" as recognition of Mr. Reinertsen's significant contribution to Reid as a 20–year employee. (Pl.'s SMF ¶ 20.)

---

**3.** Paul Revere attempts to refute this example by arguing that, from 1996 to 1997, sales actually increased for the Western Region, thereby implying that Mr. Reinertsen could not have been that impaired since 1994. (*See* Def.'s Response to Pl.'s Motion for Summary Judgment ("Def.'s Response") at 17.) But, as pointed out by Plaintiffs, Mr. Reinertsen was not Vice–President of the Western Region until 1998, so the fact that sales increased from 1996 to 1997 is irrelevant, and does not diminish Plaintiffs' argument that Mr. Reinertsen's work performance was deteriorating.

Stating further, Reid contends that, had Mr. Reinertsen not been a long-term employee who was eligible for "special pay", his pay would have been reduced by at least 50% because of his disability and resultant lack of work performance.[4] (*Id.*)

As a result of Mr. Reinertsen's continual deterioration in work performance, on March 9, 1998—four years after the initial hemorrhage and stroke—Mr. Reinertsen applied to Paul Revere for partial disability benefits, as a residually disabled employee, under the Plan.[5] (Pl.'s SMF ¶ 21.) The Group Policy provides for the payment of monthly benefits to an employee who is "residually disabled", which is defined as follows:

> **RESIDUAL DISABILITY or RESIDUALLY DISABLED** means, as a result of Injury or Sickness, the Employee is unable to perform the important duties of his own occupation on a Full-time basis, but:
>
> 1. he is able to perform one or more of the important duties of his own occupation, or any other occupation, on a Full-time or part-time basis; and
> 2. he is earning less than 80% of his Prior Earnings.

(Pl.'s SMF ¶ 22; Def.'s LR56.1 ¶ 64.) While both Plaintiffs and Defendant agree that the aforementioned definition of Residual Disability is correct, they disagree about the applicable definition of "Prior Earnings."

Plaintiffs contend that the Group Policy excludes "special pay" from the definition of "Earnings" by relying on the following definition in the "General Provisions" section:

EARNINGS (EMPLOYEES) means, for the purposes of determining an Employee's Total Disability benefit, the Employee's basic annual, monthly or weekly pay, based on a work week of not more than forty hours. Earning received from commissions and productivity incentives are included, but bonuses, overtime and other special pay are not. (Pl.'s SMF ¶ 23; Def.'s Appendix in Support of Its Motion for Summary Judgment ("Def.'s App."), Ex. E, Group Policy at PRLSP00401.) Paul Revere argues that the definition of "Earnings" that Plaintiffs rely on is erroneous, as it only refers to an employee's "Total Disability benefit"—not benefits for residually disabled individuals. Rather, according to Paul Revere, the correct definition of "Loss of Earnings", for residually disabled individuals, means the employee's prior monthly earnings minus the employee's "Actual Monthly Residual Earnings" after the date of disability. (Def.'s LR56.1 ¶ 65; Def.'s App., Ex. E, Group Policy at PRLSP00413.) Furthermore, according to Paul Revere, pursuant to the Plan documents, "Actual Monthly Residual Earnings" for a Reid employee, such as Mr. Reinertsen, means the employee's salary, wages, commissions, bonuses, fees, and income earned for services performed. (*Id.* at ¶ 66.) Therefore, according to Paul Revere, "special pay" is not exempt from the definition of "Actual Monthly Residual Earnings."

Plaintiffs counter that Paul Revere's so-called definition, or understanding, of "Earnings" is incorrect, because Paul Revere's definition already assumes that an employee has met the definition of residually disabled, and is only used to *calculate*

---

4. Despite Reid's implication that "special pay" is something the company has as a policy, Reid has presented no documents describing or defining "special pay", and there is no evidence that Reid has ever provided "special pay" to other employees, or even contemplated offering it to other employees.

5. The relevant documents that relate to Mr. Reinertsen's disability claim include the Group Policy Number G–28229, which is a group long-term disability income insurance policy ("Group Policy"), revisions thereto, and the Summary Plan Description Booklet–Certificate of Insurance ("SPD"). (Def.'s LR56.1 ¶ 5.) While Paul Revere argues that both aforementioned documents constitute "Plan documents," Plaintiffs contend that both documents are not considered "Plan documents." (Pl's Response to Def.'s LR56.1 ¶ 5.)

ensuing benefits. Furthermore, Plaintiffs argue that their definition should be applicable to residually disabled individuals—as well as totally disabled individuals—because there is no alternative definition of "Earnings" in the "General Provisions" section of the Group Policy for residually disabled individuals. In other words, according to Plaintiffs, the "Earnings" definition in the Plan is meant to apply to both totally disabled and residually disabled individuals. As will be explained *infra*, the Court finds that, under either approach, Mr. Reinertsen has still not met, at this time, the requisite loss in earnings, which is a condition precedent under the Plan for disability benefits.

As part of his application for residual disability benefits, Mr. Reinertsen submitted evidence to Paul Revere documenting his inability to perform certain important duties of his occupation due to decreased levels of cognitive functioning and short term memory skills, including materials from his employer and doctors. (Pl.'s SMF ¶ 26.) Without performing an independent examination of Mr. Reinertsen, on July 10, 1998, Paul Revere denied his application for residual disability benefits, claiming: (1) that "no evidence" had been provided to Paul Revere that Mr. Reinertsen "has been unable to perform any of his important occupational duties or to work on less than a full-time basis"; and (2) that Mr. Reinertsen had not suffered an earnings loss in excess of 20 percent. (*Id.* at ¶ 27; Def.'s LR56.1 ¶ 37.)

Pursuant to his rights under the Plan and ERISA, on September 28, 1998, Mr. Reinertsen appealed Paul Revere's denial of his application. (Def.'s LR56.1 ¶ 40.) As part of the appeal process, additional evidence was submitted by Reid, Mr. Reinertsen and Mr. Reinertsen's doctors concerning his partial disability and his inability to perform important duties of his occupation. (Pl.'s SMF ¶ 28.) On April 1, 1999, Paul Revere again denied Mr. Reinertsen's application for residual disability benefits, without undertaking an independent medical examination. The reasons Paul Revere set forth were the same as those offered in the initial denial, with the addition that Paul Revere stated that it did not feel that Mr. Reinertsen had visited doctors enough to satisfy the requirement that he was receiving "Doctor's Care." [6] (*Id.* at ¶ 29.)

As stressed by Plaintiffs, in the application process and in the appeal, Paul Revere never retained any doctor to examine Mr. Reinertsen, or even interviewed him, his doctors, or his employer. (*Id.* at ¶ 32.) Paul Revere counters that it undertook a thorough investigation and review of the medical records regarding Mr. Reinertsen's medical condition, completed an exhaustive review of his job responsibilities and activities from 1994 through the claims review process, and made repeated inquiries about Mr. Reinertsen's earnings, wages, salary and/or compensation received from Reid. After its thorough review, Paul Revere argues that it correctly determined that, because Mr. Reinertsen had returned to work in 1994 as Executive Vice–President on a full-time basis, and handled the same job responsibilities as he performed before his 1994 brain injury, he was still performing the important functions of his job, and therefore was not residually disabled. (Def.'s LR56.1(a) ¶¶ 11–13.) As will be explained *infra*, the Court finds that there is, indeed, sufficient evidence to conclude that Mr. Reinertsen was unable to perform important functions of his job.[7]

6. "Doctor's Care" under the Plan is defined as "the regular and personal care of a Doctor that, under prevailing medical standards, is appropriate for the condition causing the Disability." (Def.'s App., Ex. E, Group Policy at PRLSP00401.) As will be explained *infra*, the Court finds that Mr. Reinertsen was, indeed, seeking treatment consistent with his partial disability, and therefore, was seeking "Doctor's Care" as defined in the Plan.

7. The specific medical and other evidence submitted by Mr. Reinertsen will be discussed fully in the "Analysis" section of this Opinion.

Finally, another contention between the parties is the significance of the language in the SPD, which undisputedly grants discretion to the Plan administrator (in this case Paul Revere), in determining whether an employee qualifies for benefits. The SPD states that the Claims Administrator (Paul Revere) has "full, final, complete, conclusive and exclusive discretion to determine eligibility for coverage and benefits under the Group Policy, to determine the amount of any benefits payable under the Group Policy, and to construe and interpret the terms and conditions of the Group Policy and all related documents." (Pl.'s SMF ¶ 25.) Significantly, it also states that "[i]f there are discrepancies among the plan, the Group Policy and this SPD, the Group Policy will control." (Pl.'s Response to Def.'s LR56.1 at ¶ 63.)

While both Plaintiffs and Defendant agree that the SPD grants discretion to Paul Revere, and that the Group Policy describing the Plan does *not* afford any discretion to the administrator, (or, more accurately, is silent with respect to such discretion), the parties dispute which language is controlling. As will be explained *infra*, the Court finds that the language in the Group Policy (not the SPD) is controlling, and consequently, that no discretion is afforded to Paul Revere in making disability determinations.

### PROCEDURAL HISTORY

On September 15, 1999, Plaintiffs filed a two-count Complaint against Paul Revere. Count one is Mr. Reinertsen's claim for disability benefits under the Plan, where he requests a declaration that he is residually disabled under the Plan and, consequently, has a right to receive benefits.[8] (Complaint ¶ 28(a).) Count two is Reid's claim for breach of fiduciary duty, where it requests an award of losses to the Plan, and an award of profits which were made through the use of the assets of the Plan,

resulting from the breach of Paul Revere's fiduciary duties. (Complaint ¶ 31.)

On November 24, 1999, this case was reassigned to this Court pursuant to Local Rule 73.1. On October 30, 2000, Plaintiffs and Defendant submitted cross-motions for summary judgment, the present motions before the Court.

### ANALYSIS

■ There are three primary issues that must be resolved in the case *sub judice:* (1) the Court's appropriate level of review; (2) whether Mr. Reinertsen was unable to perform some of the "important duties of his own occupation"; and (3) whether he met the loss in compensation requirement under the Plan. First, the Court must determine the appropriate standard of review of a denial of benefits under ERISA. The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where a plan confers power on the administrator (or fiduciary) to exercise discretion, the appropriate standard of review is the deferential "arbitrary and capricious" one. *Id.* at 111–12, 109 S.Ct. 948. Second (and third), after deciding what level of review to apply, the Court must determine whether, under the appropriate level of review, Mr. Reinertsen has met the conditions precedent of the Plan, namely whether he is not performing an important function of his job, and whether he meets the 20% reduction in compensation requirement.

### I. The Court Should Apply a De Novo Review of the Plan.

■ In deciding what level of review to apply (*e.g.,* de novo or arbitrary and

---

8. Alternatively, Mr. Reinertsen requests that the reduction in compensation requirement

be declared contrary to public policy. (Complaint ¶ 28(a).)

capricious), the Court reviews the language of the Plan de novo, as it would review the language of any contract. *Mers v. Marriott Intern. Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1019–1020 (7th Cir.1998). The Seventh Circuit recently held in *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330–331 (7th Cir.2000), that the default rule, if a plan does not specify the level of review or is ambiguous, is to be plenary (i.e. de novo review). Considering the importance of "fringe benefits covered by ERISA plans to modern employees," the "conferral of discretion is not to be assumed." *Id.* at 331.

The case *sub judice* appears to present a case of first impression in the Seventh Circuit, however. While the Group Policy does not afford discretion—indeed, it is silent on discretion, thereby implicating the default rule of de novo review—the SPD unambiguously confers discretion on the plan administrator or fiduciary. Both Plaintiffs and Defendant cite a myriad of cases that they argue support their respective positions concerning the correct level of review. However, as will be explained, each case can be distinguished from the facts of the case at bar, and does not fully address the unique situation present here.

Plaintiffs argue that in *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 540 (7th Cir.2000), the court, in interpreting virtually identical terms in a Paul Revere disability policy, concluded that the policy did not afford discretion to the Plan administrator. However, in *Postma*, there was no SPD that provided for discretion. Indeed, Paul Revere does not contend that the Group Policy provides discretion—it concedes that it is silent—but it argues that the Group Policy should be considered together with the SPD, which unambiguously does provide for discretion. In support of this position, Paul Revere argues that Plan documents encompass *both* the Group Policy and the SPD, and that, read together, it is unequivocally clear that the Plan, as a whole, provides for discretion.

Paul Revere further argues that the Seventh Circuit has reviewed wording in SPDs to determine whether the Plan, as a whole, affords discretion. Paul Revere cites *Wilczynski v. Kemper Nat. Ins. Companies*, 178 F.3d 933 (7th Cir.1999) and *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703 (7th Cir.1999), cert. denied, 528 U.S. 1136, 120 S.Ct. 979, 145 L.Ed.2d 930 (2000), for this proposition.[9] But, as Plaintiffs point out, *Wilczynski* is not entirely favorable to Paul Revere's position. In *Wilczynski*, the district court applied the arbitrary and capricious standard, citing language from the plan. But, on appeal, the Seventh Circuit noted that the district court had relied on language in the SPD—not the Plan itself—in conferring discretion, thereby implying that the district court had used the wrong language.[10] *Wilczynski*, 178 F.3d at 934. While the Seventh Circuit then reviewed the plan language and the SPD,[11] it ultimately decided that it did not need to determine the appropriate standard of re-

---

**9.** Paul Revere also relies on *Mers, supra*, to argue that courts have used language in SPDs to grant discretion to the administrator. But, in *Mers*, there was no discussion of the language in the underlying policy with respect to granting discretion. Hence, just as *Postma, supra*, only dealt with language in the group policy—not the SPD—, *Mers* only deals with language in an SPD—not the policy. Thus, both cases are distinguishable from the case *sub judice*, because, here, we are dealing with language in *both* the Group Policy and SPD—not just one or the other.

**10.** Specifically, *Wilczynski* states: "The representations of the parties before this Court lead

us to believe that the district court was relying on the Summary Plan Description, rather than the Plan itself, to confer discretion. The Plan does not contain the language quoted by the district court nor any comparable language that might justify the arbitrary and capricious standard of review." *Wilczynski*, 178 F.3d at 934.

**11.** In a footnote, the Seventh Circuit noted that it was not convinced that the SPD language even conferred discretion. *See Wilczynski*, 178 F.3d at 934, fn. 2.

view because, as a practical matter, the administrator's termination of benefits was justified even under the less deferential (de novo) standard of review.

Paul Revere argues that the significance of *Wilczynski* is that the Seventh Circuit reviewed *both* the language in the SPD and the policy, even though it ultimately decided that it did not need to determine the appropriate level of review. Similarly, as argued by Paul Revere, the court in *Health Cost* also reviewed an SPD and the underlying policy, even though the court ultimately held that there was no conflict between the relevant provisions. *Health Cost*, 187 F.3d at 711–712. While this Court acknowledges that courts often review the terms in an SPD—and not just the terms of the group policy—the pertinent question is what happens when there is a conflict between the provisions.

▉ Plaintiffs concede that the SPD provides for discretion, but argue that this only means that there is a bona fide conflict between the Group Policy, which provides objective terms for determining whether someone is residually disabled, and the SPD, which affords discretion. Plaintiffs correctly assert that, as a matter of law, when there is a conflict between the policy and the SPD, the terms of the policy govern, unless the participant detrimentally relied on the terms in the SPD (which is not the case here). As stated in *Health Cost, supra*, 187 F.3d at 711:

> When ... the plan and the summary plan description conflict, the former governs, being more complete—the original, as it were, which the summary plan description excerpts and translates into language that may be imprecise because it is designed to be intelligible to lay persons—unless the plan participant or beneficiary has reasonably relied on the summary plan description to his detriment.

Furthermore, as pointed out by Plaintiffs, Paul Revere's own SPD explicitly states that "[i]f there are discrepancies among the plan, the Group Policy and this SPD, the Group Policy will control." (Pl.'s Response to Def.'s LR56.1 at ¶ 63.)

While acknowledging the law in the Seventh Circuit concerning conflicts between policies and SPDs, and the wording in its own SPD, Paul Revere vehemently maintains that there is no conflict in the case *sub judice*. Rather, Paul Revere argues that silence in one document (i.e. the Group Policy) does not operate as a contradiction of the expressed terms of another plan document (i.e. the SPD), and largely relies on the Seventh Circuit case, *Mers, supra*, for this proposition. But, in *Mers*, the court stated the common sense rule that an SPD's silence on an issue does not estop a plan administrator from relying on more detailed policy terms when no direct conflict exists. *See Mers*, 144 F.3d at 1024. Indeed, since an SPD is a summary, it is obvious that the underlying policy would encompass more detail. Here, however, it is the SPD which affords discretion—in essence, more detail—and the underlying policy does not. Therefore, Mers' common sense rule does not apply.

▉ In sum, none of the cases mentioned by the parties fully address the precise issue here, where an SPD grants discretion and the Group Policy is silent. However, a case in the Second Circuit (that neither party mentioned) addresses this issue, and provides persuasive authority that the Court should apply de novo review in the case at bar. In *Clark v. Bank of New York*, 801 F.Supp. 1182 (S.D.N.Y.1992), the SPD provided for discretion and the group policy was silent. In holding that an SPD cannot *expand* the plan administrator's authority, the court stated:

> Although a plan summary may expand employees' rights when the summary conflicts with the plan itself, *no court has found that a plan summary can expand the plan administrator's authority.* Although the plan summary states that the plan administrator has authority to interpret the Plan, the *Plan itself*

*is **silent** as to the plan administrator's discretionary authority.* Because I decline to diminish the rights of plan participants based on the plan summary, *especially where the plan summary **conflicts** with the Plan itself,* I find that defendant has failed to prove that the Plan vested [plan administrator] with discretionary authority. Therefore, [plan administrator's] determination that plaintiffs did not qualify under the Plan for severance benefits must be reviewed under a de novo standard of review.

801 F.Supp. at 1190 (emphasis added). Significantly, the court in *Clark,* while stating that the Plan itself was "silent" with respect to discretion, nonetheless found a conflict between the silence of the policy and the affirmative grant of discretion by the SPD—the exact situation here. Although Paul Revere argues that silence does not mean a conflict *per se,* this Court finds that, in the context of granting authority to a plan administrator, unless the policy affirmatively grants discretion, then de novo review applies, even if the SPD provides otherwise. This approach is consistent with the Seventh Circuit's rationale in *Herzberger, supra,* which held that, unless the plan affirmatively grants discretion, then the default rule of de novo review applies. While *Herzberger* did not involve contrary language in an SPD, it made clear that there must be an *affirmative* grant of discretion in the plan or policy (it even applied safe harbor language). Hence, silence—and not an affirmative grant—is, indeed, a conflict with discretionary language in the SPD, and, in the Seventh Circuit (as well as in Paul Revere's own Plan) the Group Policy takes precedence over conflicting language in the SPD (unless the plan participant detrimentally relied on the contrary SPD provision, which is not the case here). Therefore, whether Mr. Reinertsen qualified for residual disability benefits under Paul Re-

vere's Plan must be reviewed under a de novo standard of review.

## II. Under a De Novo Standard of Review, Mr. Reinertsen Has Not Met Both Condition Precedents of the Plan.

■ It is the burden of the plan participant, in this case Mr. Reinertsen, to prove that he is entitled to residual disability benefits under the Plan. *See Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 179 (7th Cir.1994). Under the Plan, in order to qualify as residually disabled, Mr. Reinertsen must prove that he is unable to perform the important duties of his own occupation on a full-time basis, but that (1) he is able to perform one or more of the important duties of his own occupation, or any occupation, on a full-time or part-time basis; and (2) he is earning less than 80% of his prior earnings. (Pl.'s SMF ¶ 22.) After a plan participant meets the aforementioned definition, he or she is considered "residually disabled." However, according to the terms of the Group Policy, that individual is not eligible to receive any benefits, until he or she completes the "Elimination Period",[12] which in the case *sub judice* is 90 days. As will be explained, while the Court finds that Mr. Reinertsen has satisfactorily ·proved that he is unable to perform all of the important functions of his job, he has not met, at this time, the loss in earnings requirement.

### A. Mr. Reinertsen is Not Able to Perform All of the Important Duties of His Occupation.

■ The Court finds, under its de novo review, that there is ample evidence that Mr. Reinertsen is partially disabled and unable to perform all of the important duties of his occupation as a senior executive. The Court finds Paul Revere's contention that Mr. Reinertsen has been working full-time since 1994, with no decrease in job responsibilities or perfor-

---

12. "Elimination Period" means the length of time that the Employee must be Totally or Residually Disabled before benefits begin.

(Def.'s App., Ex. E, Group Policy at PRLSP00411.)

mance, and therefore not partially disabled, to be inconsistent with the evidence in the administrative record. As a preliminary matter (which is interrelated with the present question concerning evidence of Mr. Reinertsen's partial disability), Paul Revere requests that the Court strike portions of Mr. Reinertsen and Mr. Coffman's [13] declarations in support of Plaintiffs' Motion for Summary Judgment, and also to strike Dr. Stephen Rothke's medical report, which was not before the plan administrator (Paul Revere) when it decided to deny Mr. Reinertsen's claim for disability benefits. For the following reasons, the Court denies Paul Revere's Motion to Strike.

 Paul Revere incorrectly argues that Mr. Reinertsen's declaration attempts to introduce medical/expert testimony regarding his medical condition, for which he is not competent to testify. However, the Court finds that it is proper for Mr. Reinertsen to describe how his work performance has gradually deteriorated since his 1994 stroke and hemorrhage, of which there is no dispute. Mr. Reinertsen's descriptions of his work performance problems are not only relevant to whether he is able to perform all of the important functions of his job, but also consistent, as will be shown *infra*, with the medical evidence. Furthermore, the Seventh Circuit has noted that a "witness does not need to be a doctor to discuss his or her health in general terms." *Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir.1998). Hence, the Court will not strike Mr. Reinertsen's descriptions of work performance problems, such as his complaints of decreased levels of cognitive functioning, reduced memory skills, and other debilitating symptoms.

The Court will also not strike Mr. Coffman's descriptions of Mr. Reinertsen's work deficiencies. Indeed, Dr. Prigatano's neuropsychological report (dated February 23, 1999) [14]—a report that Paul Revere heavily relies on to argue that Mr. Reinertsen is not residually disabled—states that Mr. Reinertsen's performance on neurological tests indicated "there are subtle problems in concentration, memory, and difficulty in modulating affect" and significantly, that "the question of his handling his old job responsibilities can only partially be answered by the neurophysiological examination" and that "[o]ne would also need documentation from his supervisors as to whether or not he in fact has shown a progressive decline in his performance that would preclude him from working in an executive position." (Pl.'s Appendix of Evidentiary Materials ("Pl.'s App."), Tab C-1, Prigatano Neuropsychological Report at p. 7.) In other words, Dr. Prigatano explicitly states that there needs to be documentation from supervisors as to whether Mr. Reinertsen can fully perform his job. As such, Plaintiffs submitted the declaration from Mr. Coffman, Reid's President and Mr. Reinertsen's immediate supervisor, who had first-hand knowledge of Mr. Reinertsen's work deficiencies. Indeed, as posited by Plaintiffs, who else but the President of Reid, who was also Mr. Reinertsen's immediate supervisor, would be more qualified to testify about Mr. Reinertsen's deterioration in work performance? [15] Additionally, Mr. Coffman's as-

---

13. Mr. Coffman is Reid's President.

14. Dr. Prigatano's report was submitted to Paul Revere during the appeal process. Hence, this report is properly part of the administrative record.

15. Besides his declaration in support of Plaintiffs' Motion for Summary Judgment, Mr. Coffman also sent a letter with Mr. Reinertsen's March 1998 application for disability benefits. In this letter, he stated: "It has become increasingly apparent that Mr. Reinertsen's physical and mental health continues to deteriorate as a result of the challenging demands and increasing responsibility of his position as Executive Vice President of Sales. It is my sincere concern that Mr. Reinertsen can not continue to contribute to [Reid's] Sales/Management without severe health consequences. Additionally, we have observed his inability to perform at the level of service required by a member of Senior Management." (Def.'s App., Ex. C, Mr. Coffman's March 9, 1998 letter.) Furthermore, on Janu-

sertions about Mr. Reinertsen, and his gradual performance deterioration, are consistent with Dr. Prigatano's report, which indicated that, although on some aspects Mr. Reinertsen's memory is within the average range, assuming that he was functioning in the "bright-normal range" prior to the 1994 stroke, "average performance may not be normal for him." (*Id.*)

Furthermore, both Mr. Reinertsen and Mr. Coffman's declarations are entirely consistent with the other evidence before the Court. First, there is no dispute that, in 1998, Mr. Reinertsen was relieved of his responsibilities as Executive Vice–President of Sales for the entire company—a position where he supervised at least fifteen employees—and given a position, as Executive Vice–President of Sales—Western Region—where he is only responsible for four to six employees.[16]

Second, Mr. Reinertsen's attending physician, Dr. Douglas E. Anderson, filled out a form for Mr. Reinertsen's March 1998 application for disability benefits, checking the box indicating that he considered Mr. Reinertsen to be "continuously unable to work in his/her occupation." (Def.'s App., Ex. C, Physician's Statement of Disability Application.) Significantly, Dr. Anderson also noted that Mr. Reinertsen's present limitations include "decreased memory, decreased attention span." (*Id.*) Furthermore, in a June 10, 1998 letter to Paul Revere, Dr. Anderson wrote:

> It is apparent that this patient has had continuing difficulties since a severe subarachnoid hemorrhage the etiology of which has never been fully documented despite multiple angiograms and MRIs of both the brain and spinal cord. He is partially disabled following this subarachnoid hemorrhage and subsequent episodic retro-orbital pain due to a decreased level of cognitive functioning and short term memory skills.

(Pl.'s App., Tab D, Anderson June 10, 1998 letter.)

Although Paul Revere did not have its own doctors meet with Mr. Reinertsen, it erroneously concluded that Mr. Reinertsen was fully engaged in his occupational activities and responsibilities, and that there was no evidence that his job responsibilities had diminished. Paul Revere harps on the fact that Mr. Reinertsen has been working sixty hours a week since his 1994 stroke. But, as pointed out by Plaintiffs, the number of hours Mr. Reinertsen works is irrelevant under the Plan's definition of a residual disability. Indeed, the definition specifically states that an employee may be working full-time and still be residually disabled—the question is the employee's level of functioning, not the hours he works.

■ Paul Revere also selectively cites to Dr. Prigatano's report concerning Mr. Reinertsen's level of work performance, claiming that Dr. Prigatano concluded that there was no indication from a neuropsychological assessment that Reinertsen was precluded from performing his occupational duties. This summary of his report is incorrect, as Dr. Prigatano states that,

---

ary 25, 1999—during the appeal process—Mr. Coffman sent another letter to Paul Revere, stating in relevant part: "Due to the aneurysm he experienced in 1994, he [Mr. Reinertsen] has been unable to perform all of the important duties and demands of his occupation on a full time basis. He is, and has been, experiencing short and long term memory loss and has been absent from the day-to-day operations of our business due to these reoccurring episodes of ill and unstable health. Furthermore, as a member of Senior Management, his inability to process complex information, stay technically current and use good business judgment has been significantly lim-

ited. Other [Paul Revere] personnel have had to monitor and support Mr. Reinertsen's efforts because of his inability to perform his job requirements on a full time basis." (Pl.'s App., Tab F, Coffman January 25, 1999 letter.)

16. In addition, there is evidence that the sales for 1998 decreased in the Western Region—when Mr. Reinertsen was in charge of that region—while the 1998 sales increased for the Eastern Region—where Mr. Reinertsen was not in charge.

while Mr. Reinertsen's "overall performance ... is average, I do believe there are subtle problems in concentration, memory and difficulty modulating affect." (Pl.'s App., Tab C–1, Prigatano Neuropsychological Report at p. 7.) He also concludes that, while Mr. Reinertsen is not precluded from work, average performance on the neuropsychological tests does not necessarily mean normal performance for this patient.[17] (*Id.*) Finally, Dr. Prigatano clearly states that, whether Mr. Reinertsen's occupational duties are impaired is a question that would need to be answered, in part, by his employer, Reid. Therefore, despite Paul Revere's insistence that Mr. Reinertsen is not occupationally impaired, there is abundant evidence that he is, indeed, not performing all of the important functions of his job.[18]

## B. Nonetheless, Mr. Reinertsen Has Not Met the Earnings Requirement Under the Group Policy.

In order to meet the definition of a residually disabled individual under the Plan, Mr. Reinertsen must prove that he is earning less than 80% of his Prior Earnings. "Prior Earnings" is defined in the Group Policy as the greater of: (1) the Employee's average monthly earnings from all employment for the 12 whole calendar months immediately preceding his last regular day of active Full-time work; or (2) the Employee's highest average monthly earnings from all employment for any period of 2 successive years during the 5 year period immediately preceding his last regular day of active Full-time work. (Def's App., Ex. E, Group Policy at PRLSP00413.) According to Plaintiffs, the only definition in the Group Policy of the term "Earnings" used in "Prior Earnings" is contained in the "General Provisions" section, which states that "Earnings" includes "commissions and productivity incentives," while "bonuses, overtime and other special pay are not" included. (*Id.* at PRLSP00401.) While this definition of "Earnings" in the "General Provisions" section states that it is for the purpose of determining an employee's "Total Disability" benefit, there is no other definition of "Earnings" in the General Provisions for determining an employee's residual disability benefit. Accordingly, Plaintiffs argue that this definition, although specifying that it is for

17. While Dr. Prigatano does state that Mr. Reinertsen's cognitive condition "would not preclude him from work," this statement does not mean, as Paul Revere repeatedly contends, that Mr. Reinertsen is not residually disabled. Indeed, being residually disabled means that an individual can work on a full or part-time basis. (If the participant could not work at all, he would be totally disabled—not residually disabled). Rather, the question is whether there are some important duties that the participant cannot do, despite the participant's working full or part-time.

18. Plaintiffs and Defendant spend a substantial part of their respective briefs arguing about whether this Court should consider Dr. Steven E. Rothke's medical report dated May 27, 2000. Paul Revere asserts that this report was not provided to it during the ERISA process and, in fact, was not provided to it until over a year after Mr. Reinertsen's claim for disability benefits had been adjudicated. Consequently, according to Paul Revere, this report should be stricken (indeed, it is part of Paul Revere's Motion to Strike) because it

was not properly part of the administrative record. Plaintiffs argue that, under a de novo review, the Court may consider evidence outside of the administrative record. While the Court agrees that under de novo review it may consider evidence outside of the administrative record (*see Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975 (7th Cir.1999)), it is not necessary in the case at bar. While Dr. Rothke's medical record clearly supports Plaintiffs' claim that Mr. Reinertsen cannot perform all of the important duties of his occupation (indeed, Dr. Rothke's report states that Mr. Reinertsen meets the definition of "Residual Disability" as defined in Paul Revere's Group Policy, and that Reid has already modified Mr. Reinertsen's executive position as much as can be reasonably done to accommodate his reduced neuropsychological capabilities (Pl.'s App., Tab C–2, Rothke May 27, 2000 report at pp. 9–10.)), the Court finds that this conclusion can be inextricably drawn from the abundant evidence already before the Court in the administrative record.

totally disabled employees, must also apply to residually disabled employees

Paul Revere contends that the unambiguous definition of "Earnings" in the General Provisions section of the Group Policy clearly does not apply to residually disabled individuals, but only to totally disabled individuals. Furthermore, Paul Revere offers an alternative definition, relying on the calculation of "Loss of Earnings" in the "Benefit Calculation for Residual Disability" section of the Group Policy. Since "Loss of Earnings" is calculated by subtracting an employee's "Actual Monthly Residual Earnings" from his or her "Prior Earnings", and "Actual Monthly Residual Earnings" is defined as an employee's "salary, wages, commissions, bonuses, fees, and income earned for services performed" (and does not exclude "special pay") (Def.'s App., Ex. E, Group Policy at PRLSP00413), then, according to Paul Revere, Mr. Reinertsen has not suffered an adequate loss in earnings as required by the Plan. (*See* Def.'s Reply Memorandum in Support of Motion for Summary Judgment ("Def.'s Reply") at 11.) Plaintiffs maintain, however, that Paul Revere's definition of "Earnings" (by using the formula for "Loss of Earnings") already assumes that an employee is residually disabled, and is only used to calculate ensuing benefits—not to determine

who meets the definition of a residually disabled employee.

■ The Court finds that it does not need to resolve which parties' definition of "Earnings" is applicable to the case *sub judice*, because, assuming the more favorable definition advocated by Plaintiffs, the Court finds that Mr. Reinertsen has still not suffered an "Earnings Loss" within the meaning of the Plan. While Plaintiffs' definition of "Earnings" excludes "special pay", neither the Group Policy nor any policy of Reid defines "special pay." Nonetheless, Plaintiffs argue that "special pay" must encompass the present situation, where an employer pays an employee "loyalty" payments for 20 years of service, even though the employee is partially disabled and only half as productive. Importantly, despite the fact that the burden of proving the conditions precedent under the Plan is on Plaintiffs, Reid has no written policy describing this unique arrangement, and there is no evidence that Reid has ever contemplated providing "special pay" or "loyalty" payments to other employees. Furthermore, as pointed out by Paul Revere, Plaintiffs never stated when this arrangement of "special pay" began.[19] As explained in the Group Policy, once an employee meets the definition of a residually disabled individual, that employee must wait the time period set forth in the "Elimination Period,"—which in this case is 90 days—before receiving benefits.[20]

19. Plaintiffs argue that, because Paul Revere failed to apprize Plaintiffs that "special pay" is considered "earnings" under the Plan, Paul Revere is, essentially, estopped from denying Mr. Reinertsen's claim on the basis that he did not satisfy the requisite loss of earnings in excess of 20%. In a May 9, 1998 letter, however, Paul Revere specifically requested more information from Mr. Reinertsen concerning the date on which he was first claiming Residual Disability, and payroll records describing his earnings from 1994 to 1998. (Def.'s App., Ex. C, May 9, 1998 letter at PRLCL00075.) Furthermore, the administrative record is replete with letters from Paul Revere, repeatedly advising Plaintiffs that Mr. Reinertsen had not demonstrated a greater than 20% loss in earnings, and had not provided it with any payroll or other financial information which could potentially establish

the loss in earnings requirement. Therefore, the Court finds that Paul Revere is not estopped from asserting that Mr. Reinertsen has not met the earnings requirement, or that special pay is considered earnings.

20. Furthermore, according to the Group Policy, an employee who meets the definition of a residually disabled individual must also be receiving "Doctor's Care", which is defined as the "regular and personal care of a Doctor that, under prevailing medical standards, is appropriate for the condition causing the Disability" (Def.'s App., Ex. E, Group Policy at PRLSP00401.) While Paul Revere claims, as another reason to deny benefits, that Mr. Reinertsen is not receiving "Doctor's Care", the Court finds, after reviewing the administrative record, that Mr. Reinertsen has dili-

Since Mr. Reinertsen never provided a date when "special pay" began (and it is his burden to provide such information), Paul Revere cannot determine the beginning and end of the "Elimination Period."

In any event, while the Court finds it laudable that Reid has been so devoted to Mr. Reinertsen by providing him full salary for half the work, the incontrovertible fact is that, between 1994 and 1999, Mr. Reinertsen's salary has remained constant at $94,999.92. (Pl.'s App., Tab A,1, Reinertsen's Declaration.)[21] In a January 25, 1999 letter to Paul Revere, Mr. Coffman, Reid's President, admitted as much, writing that Reid "has not reduced Mr. Reinertsen's compensation in consideration of his longevity with the company and the adverse affect that reduced compensation would have on him and his family." (Def.'s App., Ex. C, Coffman Jan. 25, 1999 letter at PRLCL00314.) To the Court, and apparently to Paul Revere, it is irrelevant *why* Reid is paying Mr. Reinertsen's full salary. The underlying purpose of the Plan is to compensate partially disabled employees who are working, but not realizing as much compensation. If Mr. Reinertsen is realizing as much compensation as before his illness, it is irrelevant that he is truly only "earning" 50%, as Reid contends. If "special pay" is defined, as Plaintiffs argue it should be, to encompass loyalty payments (even though Reid has no written policy describing loyalty payments or special pay), then any employer and employee could frustrate the loss in earnings requirement under the Plan.

Significantly, however, this does not mean that, at a later time, Mr. Reinertsen

would not qualify as a residually disabled individual under the Plan. In other words, once Mr. Reinertsen meets the loss in earnings requirement, and then waits 90 days (the Elimination Period), he will likely qualify for residual benefits under the Plan. In this regard, the Court has already found, under its de novo review of the current administrative record, that Mr. Reinertsen is not performing some of the important functions of his job. It appears that the only obstacle remaining, therefore, is the loss in earnings requirement in excess of 20%.

### CONCLUSION

For the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment, and denies Plaintiffs' Motion for Summary Judgment. Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment be, and the same hereby is, DENIED.

---

gently followed his physicians' instructions. Furthermore, the Court finds it incredible that Paul Revere could conclude that Mr. Reinertsen is not receiving "Doctor's Care"—which implicates "prevailing medical standards"—when Paul Revere never had any of its own medical professionals evaluate Mr. Reinertsen.

21. His salary is not his total compensation, however, because Mr. Reinertsen also received substantial commissions and bonuses.

His total compensation for 1994 was $146,222.49; for 1995 was $163,563.62; for 1996 was $170,517.37; for 1997 was $182,443.66; for 1998 was $186,522.86; and for 1999 was $179,100.78. (Pl.'s App., Tab A,1, Reinertsen's Declaration.) Under the definition of "Earnings" advocated by Plaintiffs, "Earnings" would include his salary and commissions, but not his bonus or "special pay."